# MAINE *v.* MOULTON

No. 84–786.   Argued October 8, 1985—Decided December 10, 1985

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which WHITE and REHNQUIST, JJ., joined, and in Parts I and III of which O'CONNOR, J., joined, *post*, p. 181.

*Wayne S. Moss*, Assistant Attorney General of Maine, argued the cause for petitioner. With him on the briefs were *James E. Tierney*, Attorney General, and *Charles K. Leadbetter, James T. Kilbreth III*, and *Eric E. Wright*, Assistant Attorneys General.

*Anthony W. Beardsley*, by appointment of the Court, 470 U. S. 1082, argued the cause for respondent. With him on the brief were *David P. Cluchey* and *Charles S. Sims*.*

JUSTICE BRENNAN delivered the opinion of the Court.

The question presented in this case is whether respondent's Sixth Amendment right to the assistance of counsel was violated by the admission at trial of incriminating statements made by him to his codefendant, a secret government informant, after indictment and at a meeting of the two to plan defense strategy for the upcoming trial.

I

On the night of January 15, 1981, police officers in Belfast, Maine, responded to a fire call in the vicinity of the Belfast Dodge automobile dealership. Arriving at the scene, the officers discovered a burning Chevrolet dump truck which they recognized as a vehicle that had been reported stolen.[1]

---

*Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey, Edwin S. Kneedler*, and *Kathleen A. Felton* filed a brief for the United States as *amicus curiae* urging reversal.

[1] Indeed, in pursuing an anonymous tip received earlier that day that the stolen truck could be found at Belfast Dodge, one of the officers had conducted a consent search of the main building of the dealership facility.

After examining the burning truck, the officers searched a building located on the Belfast Dodge property. This building was not part of the dealership, but was leased to respondent Perley Moulton and his codefendant Gary Colson who were using the space to restore and sell old Ford Mustangs. Inside, the officers discovered evidence of several recent automobile and automobile-related thefts.

On April 7, 1981, a Waldo County grand jury returned indictments charging Moulton and Colson with four counts of theft by receiving in violation of Me. Rev. Stat. Ann., Tit. 17–A, § 359 (1983). Specifically, the indictments alleged that Moulton and Colson received, retained, or disposed of a 1978 Ford pickup truck, a 1978 Chevrolet dump truck, a 1970 Ford Mustang automobile, and assorted Ford Motor Company automotive parts knowing these to be stolen and intending to deprive the owners of possession. On April 9, Moulton and Colson, represented by retained counsel, appeared before the Maine Superior Court for Waldo County and entered pleas of not guilty. Both were enlarged on bail pending trial. Numerous proceedings, unnecessary to detail here, occurred during the ensuing year and a half.

On November 4, 1982, Colson complained by telephone to Robert Keating, Chief of the Belfast Police Department, that he had received anonymous threatening telephone calls regarding the charges pending against him and Moulton, and indicated that he wished to talk to the police about the charges. Keating told Colson to speak with his lawyer and to call back.

On November 6, Colson met with Moulton at a Belfast restaurant to plan for their upcoming trial. According to Colson, Moulton suggested the possibility of killing Gary Elwell, a State's witness, and they discussed how to commit the murder.

On November 9 and 10, Colson, accompanied by his lawyer, met with Police Chief Keating and State Police Detective Rexford Kelley. At these meetings, Colson gave full

confessions of his participation with Moulton in committing the crimes for which they had been indicted. In addition, Colson admitted that he and Moulton had not merely received stolen automotive parts, but also had broken into the local Ford dealership to steal the parts. Colson also stated that he and Moulton had set fire to the dump truck and had committed other thefts. The officers offered Colson a deal: no further charges would be brought against him if he would testify against Moulton and otherwise cooperate in the prosecution of Moulton on the pending charges. Colson agreed to cooperate.[2]

Colson also discussed with Keating and Kelley the anonymous threats he had received and Moulton's inchoate plan to kill Gary Elwell. Keating requested, and Colson consented, to have a recording device placed on Colson's telephone. Colson was instructed to turn the recording device on whenever he received a telephone call, but to turn it off immediately unless it was a threat from the anonymous caller or a call from Moulton.

The recording device was on Colson's telephone for over a month. Although he received no threats, Colson spoke to Moulton three times during this period, and the tapes of these calls were turned over to the police. The first conversation, on November 22, concerned primarily personal matters. The only reference to the pending criminal charges was Colson's question whether Moulton had "heard anything from the lawyer," and Moulton's response that he had not, but that he had "come up with a method" that he "ha[d] to work out the details on," and that "[s]ome day [he'd] like to get together and talk to [Colson] about it." Moulton, then

---

[2] Seven months after the conclusion of Moulton's trial, Colson pleaded guilty to two counts of theft. The prosecutor recommended that Colson be sentenced to 2 years' imprisonment, all but 15 days to be suspended, and placed on probation for 2 years. Colson also agreed to make restitution up to $2,000 during the probationary period. The trial court accepted this recommendation and sentenced Colson accordingly.

living in New Hampshire, said that he was planning to visit Belfast around Christmas.

The second telephone conversation, on December 2, was prompted by Moulton's receipt of copies of statements of three of the State's witnesses, including Elwell; Colson had not yet received copies of the statements. Most of their talk (on Moulton's side particularly) was about the statements of Elwell and Elwell's brother, which accused Moulton and Colson of being guilty of the pending charges and which Moulton complained were an attempt to frame him and Colson. After reading Colson a statement by Elwell that he had received a threatening phone call, Moulton commented "[t]his is a big joke, man."[3]   When Colson jokingly suggested that they flee to Acapulco, Moulton vehemently rejected the suggestion, stating: "No, I'm gonna stay here and I'm gonna fight it man.   I'm gonna fight it man.   I ain't gonna get framed for nothing."   Colson assented to this and suggested, "we'll have to get together sometime . . . ." Moulton reminded Colson that he would be visiting at Christmas, and the conversation ended without Moulton having said anything that incriminated him.

The third telephone conversation, which took place on December 14, was similar to the second one.   Most of the conversation concerned the pending charges, but Moulton said nothing inculpatory and continued to insist that he and Colson were being framed.   Moulton asked Colson to set aside an entire day so that the two of them could meet and plan their defense.   They agreed to meet on Sunday, December 26.

After learning from the telephone recordings about the meeting planned for December 26, the police obtained Colson's consent to be equipped with a body wire transmitter to record what was said at the meeting.   Chief Keating later testified that he did this for Colson's safety in case Moulton

---

[3] Colson testified that he never told Moulton about the threatening calls that he had received.

realized that Colson was cooperating with the police, and to record any further conversation concerning threats to witnesses. Keating also testified that he was aware that Moulton and Colson were meeting to discuss the charges for which Moulton was already under indictment. Colson was instructed "not to attempt to question Perley Moulton, just be himself in his conversation . . . ."

The December 26 meeting, as was to be expected from the recorded telephone conversations, consisted of a prolonged discussion of the pending charges—what actually had occurred, what the State's evidence would show, and what Moulton and Colson should do to obtain a verdict of acquittal. The idea of eliminating witnesses was briefly mentioned early in the conversation. After a short discussion, encouraged by Colson,[4] Moulton concluded that he did not think the plan would work. The remainder of the lengthy meeting was spent discussing the case. Moulton and Colson decided to create false alibis as their defense at trial. Because they sought to conform these alibis as closely as possible to what really happened, much of their discussion involved recounting the crimes. Although Colson had described what had happened in detail when he confessed to the police a month earlier, he now frequently professed to be unable to recall the

---

[4] The exchange went as follows:

"[Moulton:] You know I thought of a way to eliminate them. Remember we were talking about it before?

"[Colson:] Yes, you thought of a way?

"[Moulton:] Yeah, but . . . I don't think we ought to go for it.

"[Colson:] Is it foolproof?

"[Moulton:] No.

"[Colson:] Is it, is it fairly foolproof?

"[Moulton:] I like it. I think its just for the . . . .

"[Colson:] Well let me [hear it]."

Moulton explained that he had considered using air rifles to shoot poisoned darts and the conversation then turned to joking about a magazine that instructed readers how to build bombs to kill large numbers of people. Exh. S–4, Tr. of Dec. 26 Meeting 18–19.

events. Apologizing for his poor memory, he repeatedly asked Moulton to remind him about the details of what had happened, and this technique caused Moulton to make numerous incriminating statements.[5] Nor were all of Colson's memory lapses related to events that required discussion to fabricate convincing alibis. Colson also "reminisced" about events surrounding the various thefts, and this technique too elicited additional incriminating statements from Moulton. For example, Colson asked Moulton how many locks they had drilled to steal a truck, a fact obviously not relevant to developing an alibi. Similarly, Colson questioned Moulton about whether it was the Mustang or the pickup truck that did not have a heater. Later, Colson jokingly drew forth admissions from Moulton concerning the dumping of a stolen truck into a pond after it had been scavenged for parts, and the dumping of a load of potatoes from another stolen truck onto the road. Each of these statements was later admitted into evidence against Moulton at trial.

Moulton filed a pretrial motion to suppress recorded statements he made to Colson in the three telephone conversations and at the December 26 meeting, arguing, *inter alia,* that the statements were obtained in violation of the Sixth and Fourteenth Amendments. After a hearing, the trial court denied the motion. The trial court found that the recordings were made "in order to gather information concerning the anonymous threats that Mr. Colson had been

---

[5] Colson began doing this immediately after Moulton vetoed the plan to eliminate witnesses. Colson indicated that he did not have copies of all the discovery materials, and Moulton went outside to his car to get his copies. While Moulton was gone, Colson sighed heavily and whispered "[o]h boy, I just hope I can make it through this" into the microphone. Then, when Moulton returned moments later, Colson immediately stated, slowly and deliberately: "I want you to help me with some dates. One date I cannot remember Caps [Moulton's nickname], just can't remember, I know it was in December, what night did we break into Lothrop Ford? What date?" *Id.*, at 23.

receiving, to protect Mr. Colson and to gather information concerning defendant Moulton's plans to kill Gary Elwell."

Meanwhile, after Colson's role as an informant had been revealed to Moulton, the State had the pending indictments dismissed and obtained seven new indictments against Moulton. These indictments realleged the pending charges, and charged Moulton in addition with burglary, arson, and three more thefts. Moulton pleaded guilty to the charges contained in two of these indictments, and the trial court dismissed two more for improper venue. Moulton waived his right to a jury and proceeded to trial on the remaining three indictments, which covered the subjects of the original indictments and charged him with burglary, arson, and theft. At the trial, the State did not offer into evidence anything from the recorded telephone conversations, but did offer portions of the tapes of the December 26 meeting, principally those involving direct discussion of the thefts for which Moulton was originally indicted. The State did not offer the portion of the meeting during which Moulton and Colson discussed the possibility of killing witnesses and offered only one portion of the discussion about developing false testimony. At the conclusion of the trial, the court dismissed one more count of theft for improper venue and found Moulton not guilty of the arson charge. The court found Moulton guilty, however, of burglary and theft in connection with the Ford pickup truck, the Chevrolet dump truck, and the Ford automotive parts.

Moulton appealed these convictions on the ground that the admission into evidence of his statements to Colson violated his Sixth Amendment right to the assistance of counsel. The State filed a cross-appeal objecting to the dismissal of charges for improper venue. The Supreme Judicial Court of Maine granted both appeals and remanded for a new trial. 481 A. 2d 155 (1984). Regarding the admission of Moulton's recorded statements to Colson, the court agreed that there was "ample evidence" to support the trial court's finding that

the police wired Colson for legitimate purposes, but held that "[r]eference to the State's legitimate motive may be relevant to, but cannot wholly refute, the alleged infringement of Moulton's right to counsel." *Id.*, at 160. The court held that the State cannot use against Moulton at trial recordings of conversations where the State "knew, or should have known" that Moulton would make incriminating statements regarding crimes as to which charges were already pending. Pointing to Moulton's close relationship with Colson, the fact that the purpose of their meeting was to discuss the pending charges, and the fact that at the time of the meeting Colson was "fully cooperating with the police and no longer stood in the same adversarial position as did Moulton," the court held:

> "When the police recommended the use of the body wire to Colson they intentionally created a situation that they knew, or should have known, was likely to result in Moulton's making incriminating statements during his meeting with Colson. The police's valid purpose in investigating threats against witnesses does not immunize the recordings of Moulton's incriminating statements from constitutional attack. Those statements may be admissible in the investigation or prosecution of charges for which, at the time the recordings were made, adversary proceedings had not yet commenced. But as to the charges for which Moulton's right to counsel had already attached, his incriminating statements should have been ruled inadmissible at trial, given the circumstances in which they were acquired." *Id.*, at 161.

We granted the State's petition for certiorari. 469 U. S. 1206. We affirm.

## II

## A

The right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments is indispensable to the fair administration of our adversarial system of criminal jus-

tice.[6]   Embodying "a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself," *Johnson* v. *Zerbst,* 304 U. S. 458, 462–463 (1938), the right to counsel safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding.   Justice Sutherland's oft-quoted explanation in *Powell* v. *Alabama,* 287 U. S. 45 (1932), bears repetition here:

> "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.   Even the intelligent and educated layman has small and sometimes no skill in the science of law.   If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad.   He is unfamiliar with the rules of evidence.   Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible.   He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one.   He requires the guiding hand of counsel at every stage of the proceedings against him." *Id.,*

---

[6] Justice Black explained in *Gideon* v. *Wainwright,* 372 U. S. 335 (1963): "[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court . . . cannot be assured a fair trial unless counsel is provided for him.   This seems to us to be an obvious truth.   Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime.   Lawyers to prosecute are everywhere deemed essential to protect the public's interest in an orderly society.   Similarly, there are few defendants charged with crime, few indeed, who fail to hire the best lawyers they can get to prepare and present their defenses.   That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the widespread belief that lawyers in criminal courts are necessities, not luxuries.   The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours." *Id.,* at 344.

at 68–69 (quoted in *Gideon* v. *Wainwright,* 372 U. S. 335, 344–345 (1963)).

As indicated in the last sentence of this paragraph, the Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself. Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, "critical" stages in the criminal justice process "where the results might well settle the accused's fate and reduce the trial itself to a mere formality." *United States* v. *Wade,* 388 U. S. 218, 224 (1967) (quoted in *United States* v. *Gouveia,* 467 U. S. 180, 189 (1984)). See, *e. g., Coleman* v. *Alabama,* 399 U. S. 1 (1970); *Hamilton* v. *Alabama,* 368 U. S. 52 (1961); *White* v. *Maryland,* 373 U. S. 59 (1963); *Escobedo* v. *Illinois,* 378 U. S. 478 (1964); *Kirby* v. *Illinois,* 406 U. S. 682 (1972). And, "[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him . . . ." *Brewer* v. *Williams,* 430 U. S. 387, 398 (1977). This is because, after the initiation of adversary criminal proceedings, "'the government has committed itself to prosecute, and . . . the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.'" *Gouveia, supra,* at 189 (quoting *Kirby* v. *Illinois, supra,* at 689).

## B

Once the right to counsel has attached and been asserted, the State must of course honor it.[7] This means more than

---

[7] Cf. *Brewer* v. *Williams,* 430 U. S. 387 (1977): "[T]he lawyer is the essential medium through which the demands and commitments of the sover-

simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

In *Spano* v. *New York*, 360 U. S. 315 (1959), the defendant, who had already been indicted, was coercively interrogated by police until the early hours of the morning despite his repeated requests to see his lawyer. A unanimous Court reversed his conviction on the ground that the confession obtained by this interrogation was involuntary and therefore should not have been admitted into evidence at trial. Four Justices, in two concurring opinions, stated that they would also have reached this result on the ground that Spano's Sixth Amendment right to the assistance of counsel was violated. These Justices reasoned that to permit police to "produce the vital evidence in the form of a confession which is useful or necessary to obtain a conviction" in the absence of counsel, after the right to counsel has attached, is to deny the accused "effective representation by counsel at the only stage when legal aid and advice would help him." *Id.*, at 325–326 (Douglas, J., concurring, joined by Black and BRENNAN, JJ.); see also, *id.*, at 326–327 (Stewart, J., concurring, joined by Douglas and BRENNAN, JJ.). As Justice Douglas succinctly put the point, "what use is a defendant's right to effective counsel at every stage of a criminal case if, while he is held awaiting trial, he can be questioned in the absence of counsel until he confesses?" *Id.*, at 326.

eign are communicated to the citizen. If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer." *Id.*, at 415 (STEVENS, J., concurring) (footnote omitted).

The position of the concurring Justices in *Spano* was adopted by the Court in *Massiah* v. *United States*, 377 U. S. 201 (1964). Massiah was indicted, along with a man named Colson,[8] for conspiracy to possess and to distribute cocaine. Massiah retained a lawyer, pleaded not guilty and was released on bail. Colson, meanwhile, decided to cooperate with Government agents in their continuing investigation of the narcotics activity in which Massiah and others were thought to be engaged. Colson permitted a Government agent to install a radio transmitter under the front seat of his automobile. Massiah held a lengthy conversation with Colson in this automobile while a Government agent listened over the radio. Massiah made several incriminating statements, and these were brought before the jury through the testimony of the Government agent. We reversed Massiah's conviction on the ground that the incriminating statements were obtained in violation of Massiah's rights under the Sixth Amendment. The Court stressed the fact that the interview took place after indictment, at a time when Massiah was clearly entitled to the assistance of counsel. Relying on Justice Douglas' *Spano* concurrence, the Court concluded that the need for, and consequently the right to, the assistance of counsel applied equally in this extrajudicial setting as at the trial itself. 377 U. S., at 204.[9] Consequently, the Court held:

---

[8] The parties have taken pains to assure us that Massiah's friend Colson and Moulton's friend Colson are unrelated.

[9] Justice Stewart noted that this view of the right to counsel "no more than reflects a constitutional principle established as long ago as *Powell* v. *Alabama*," where the Court noted that

"'during perhaps the most critical period of the proceedings . . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants [are] as much entitled to such aid [of counsel] . . . as at the trial itself.'" *Massiah*, 377 U. S., at 205 (quoting *Powell* v. *Alabama*, 287 U. S. 45, 57 (1932)).

"[Massiah] was denied the basic protections of [the right to the assistance of counsel] when there was used against him at trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.*, at 206.

We applied this principle most recently in *United States* v. *Henry*, 447 U. S. 264 (1980). Henry was arrested and indicted for bank robbery. Counsel was appointed, and Henry was held in jail pending trial. Nichols, an inmate at the same jail and a paid informant for the Federal Bureau of Investigation, told a Government agent that he was housed in the same cellblock as several federal prisoners, including Henry. The agent told Nichols to pay attention to statements made by these prisoners, but expressly instructed Nichols not to initiate any conversations and not to question Henry regarding the bank robbery. Nichols and Henry subsequently engaged in some conversations during which Henry told Nichols about the robbery. Nichols testified about these conversations at Henry's trial, and Henry was convicted.

This Court reversed, finding that the Government had "'deliberately elicited' incriminating statements from Henry within the meaning of *Massiah.*" *Id.*, at 270. Several facts were emphasized in THE CHIEF JUSTICE's opinion for the Court: that Nichols was acting as an informant for the Government and therefore had an incentive to produce useful information; that Henry was unaware of Nichols' role as a Government informant; and, finally, that Henry and Nichols were incarcerated together at the time the conversations took place. With respect to this last fact, the Court reasoned that "confinement may bring into play subtle influences that will make [an individual] particularly susceptible to the ploys of undercover Government agents," influences that were facilitated by Nichols' "apparent status as a person sharing a common plight." *Id.*, at 274. Considering Nich-

ols' conversations with Henry in light of these circumstances, the Court concluded that Nichols "deliberately used his position to secure incriminating information from Henry when counsel was not present" in violation of the Sixth Amendment. *Id.*, at 270–271. The Government argued that it should not be held responsible for Nichols' conduct because its agent had instructed Nichols not to question Henry and had not intended that Nichols take affirmative steps to obtain incriminating statements. We rejected this argument, finding that, under the circumstances, the agent "must have known" that Nichols would take affirmative steps to secure incriminating information. *Id.*, at 271. Consequently, the Court held, "[b]y intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Id.*, at 274.

## C

The State contends that the decisive fact in *Massiah* and *Henry* was that the police set up the confrontation between the accused and a police agent at which incriminating statements were elicited. Supported by the United States as *amicus curiae*, the State maintains that the Sixth Amendment is violated only when police intentionally take this or some equivalent step. Because Moulton rather than Colson initiated the recorded telephone conversations and requested the December 26 meeting, the State concludes that Moulton's Sixth Amendment rights were not violated here.

In the first place, the identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in *Massiah* or *Henry*. Thus, while in *Massiah* it may have been the Government agent who was responsible for setting up the meeting with the defendant,[10] one discovers

---

[10] It is not clear whether the informant asked to meet with Massiah or vice versa. Both the opinion for the Second Circuit and the dissent state

this only by looking to the opinions of the Court of Appeals. It is not mentioned in this Court's opinion since the issue of who set up the meeting with whom was not pertinent to our disposition. Moreover, four years after *Massiah*, the Court summarily reversed a conviction where the defendant requested the meeting and initiated and led the conversation in which incriminating statements were made to an undercover informant. *Beatty* v. *United States*, 389 U. S. 45 (1967) *(per curiam)*. In that case, the Solicitor General made the same argument that he and the State make today, see Brief in Opposition, *Beatty* v. *United States*, O. T. 1967, No. 338, pp. 5–8; we rejected this argument in an opinion that simply cited *Massiah*.[11] Finally, in *Henry*, we deemed it "irrelevant that in *Massiah* the agent had to arrange the meeting between Massiah and his codefendant while here the agents were fortunate enough to have an undercover informant already in close proximity to the accused." 447 U. S., at 272, n. 10.

---

only that, on the instructions of a Government agent, Colson invited Massiah into his car to discuss their case; neither opinion establishes who requested the meeting in the first place. See *United States* v. *Massiah*, 307 F. 2d 62, 66 (1962); *id.*, at 72 (Hays, J., dissenting). It is quite plausible that Massiah asked to see Colson who then proposed meeting in his car. In fact, there is nothing in the record in *Massiah* to support even the assertion of the Court of Appeals that Colson rather than Massiah suggested meeting in Colson's car, although the inference is logical enough. See App. to Brief for United States in *Massiah* v. *United States*, O. T. 1963, No. 199, pp. 125a–175a (testimony of Agent Murphy).

[11] In his *amicus* brief for the United States in this case, the Solicitor General suggests that *Beatty* did not survive *Brewer* v. *Williams*, 430 U. S. 387 (1977), which, he contends, modified *Massiah* to require affirmative interrogation by the Government. Brief for United States as *Amicus Curiae* 17, n. 12. *That* argument, however, was expressly rejected when the Solicitor General made it in *Henry*. See 447 U. S., at 271 ("While affirmative interrogation, absent waiver, would certainly satisfy *Massiah*, we are not persuaded, as the Government contends, that *Brewer* v. *Williams* . . . modified *Massiah*'s 'deliberately elicited' test"). Cf. also, Brief for United States in *United States* v. *Henry*, O. T. 1979, No. 121, p. 26, n. 12.

Beyond this, the State's attempt to limit our holdings in *Massiah* and *Henry* fundamentally misunderstands the nature of the right we recognized in those cases. The Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State. As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The determination whether particular action by state agents violates the accused's right to the assistance of counsel must be made in light of this obligation. Thus, the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. See *Henry*, 447 U. S., at 276 (POWELL, J., concurring). However, knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.[12]

### III

Applying this principle to the case at hand, it is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant, Colson. It was the police who suggested to Colson that he record his telephone conversations with Moulton. Having learned from these recordings that

---

[12] Direct proof of the State's knowledge will seldom be available to the accused. However, as *Henry* makes clear, proof that the State "must have known" that its agent was likely to obtain incriminating statements from the accused in the absence of counsel suffices to establish a Sixth Amendment violation. See 447 U. S., at 271.

Moulton and Colson were going to meet, the police asked Colson to let them put a body wire transmitter on him to record what was said. Police Chief Keating admitted that, when they made this request, the police knew—as they must have known from the recorded telephone conversations—that Moulton and Colson were meeting for the express purpose of discussing the pending charges and planning a defense for the trial.[13] The police thus knew that Moulton would make statements that he had a constitutional right not to make to their agent prior to consulting with counsel. As in *Henry*, the fact that the police were "fortunate enough to have an undercover informant already in close proximity to the accused" does not excuse their conduct under these circumstances. 447 U. S., at 272, n. 10. By concealing the fact that Colson was an agent of the State, the police denied Moulton the opportunity to consult with counsel and thus denied him the assistance of counsel guaranteed by the Sixth Amendment.[14]

---

[13] Because Moulton thought of Colson only as his codefendant, Colson's engaging Moulton in active conversation about their upcoming trial was certain to elicit statements that Moulton would not intentionally reveal—and had a constitutional right not to reveal—to persons known to be police agents. Under these circumstances, Colson's merely participating in this conversation was "the functional equivalent of interrogation." *Henry*, 447 U. S., at 277 (POWELL, J., concurring). In addition, the tapes disclose and the Supreme Judicial Court of Maine found that Colson "frequently pressed Moulton for details of various thefts and in so doing elicited much incriminating information that the State later used at trial." 481 A. 2d, at 161. Thus, as in *Henry, supra*, at 271, n. 9, we need not reach the situation where the "listening post" cannot or does not participate in active conversation and prompt particular replies.

[14] The State argues that it took steps to prevent Colson from inducing Moulton to make incriminating admissions by instructing Colson to "be himself," "act normal," and "not interrogate" Moulton. Tr. of Hearing on Motion to Suppress 42, 51, 56. In *Henry*, we rejected this same argument although the likelihood that the accused would talk about the pending charges to a cellmate was less than here, where the accused invited his codefendant to discuss the upcoming trial, and although the instructions to the agent were far more explicit. See 447 U. S., at 268, 271. More im-

## IV

The Solicitor General argues that the incriminating statements obtained by the Maine police nevertheless should not be suppressed because the police had other, legitimate reasons for listening to Moulton's conversations with Colson, namely, to investigate Moulton's alleged plan to kill Gary Elwell and to insure Colson's safety. In *Massiah,* the Government also contended that incriminating statements obtained as a result of its deliberate efforts should not be excluded because law enforcement agents had "the right, if not indeed the duty, to continue their investigation of [Massiah] and his alleged criminal associates . . . ." 377 U. S., at 206. There, as here, the Government argued that this circumstance justified its surveillance and cured any improper acts or purposes. We rejected this argument, and held:

---

portantly, under the circumstances of this case, the instructions given to Colson were necessarily inadequate. The Sixth Amendment protects the right of the accused not to be confronted by an agent of the State regarding matters as to which the right to counsel has attached without counsel being present. This right was violated as soon as the State's agent engaged Moulton in conversation about the charges pending against him. Because these charges were the only subject to be discussed at Colson's December 26 meeting with Moulton, a Sixth Amendment violation was inevitable once Colson agreed to this meeting with Moulton.

In any event, we reject the State's suggestion that these instructions were designed to protect Moulton's constitutional rights. The instructions were obviously motivated by the police's concern that Colson, who had never before served as an undercover agent, might behave unnaturally or ask too many questions, thereby tipping Moulton off to the fact that Colson was cooperating with the police. Thus, rather than explain to Colson that actively questioning Moulton might taint any evidence obtained, the police simply told Colson to "be himself," and to "act normal." Tr. of Hearing on Motion to Suppress 42, 51, 56. In addition, the instructions were not limited to questions concerning the pending charges, the only matters as to which active questioning might create problems. On the contrary, according to Chief Keating, Colson was instructed that he could engage Moulton in a conversation but should not try to draw him out on "elimination of witnesses or anything." *Id.,* at 51.

"We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial." *Id.*, at 207 (emphasis omitted).

We reaffirm this holding, which states a sensible solution to a difficult problem. The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at a trial of either crime.[15] In seeking evidence pertaining to pending charges,

[15] In his brief, the Solicitor General assumes that the only claim made by the Government and answered by the Court in *Massiah* was that the Government was engaged in a continuing investigation of crimes as to which charges were already pending. He concedes that this was an inadequate justification which "had the flavor of a post hoc rationalization of conduct that, at its inception, in fact had as a primary purpose the obtaining of evidence for use at trial on the pending charges." Brief for United States as *Amicus Curiae* 23–24. So saying, he asks us to distinguish from that justification the justification that law enforcement officials are investigating "separate" crimes. In *Massiah*, however, the Government's assertion was that it needed to continue its investigation in order to discover the identities of Massiah's intended buyer and of others who were importing narcotics as well as to find additional evidence of Massiah's crimes. Brief for United States in *Massiah* v. *United States*, O. T. 1963, No. 199, pp. 26–27. The Court in *Massiah* was thus faced with the very same argument made by the Solicitor General in this case. Even were the Solicitor General's characterization of the issue posed in *Massiah* correct, however,

however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah*. On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. Consequently, incriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.[16]

Because we hold that the Maine police knowingly circumvented Moulton's right to have counsel present at a confrontation between Moulton and a police agent, the fact that the police had additional reasons for recording Moulton's meeting with Colson is irrelevant. The decision of the Supreme Judicial Court of Maine is affirmed.

*It is so ordered.*

---

we would not draw the distinction he asks us to make. The likelihood of *post hoc* rationalizing is the same whether police claim to be investigating other examples of the same crime or some allegedly "separate" crime. We take what we feel is a more realistic view of police investigations, and instead accept that dual purposes may exist whenever police have more than one reason to investigate someone.

[16] Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.

CHIEF JUSTICE BURGER, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, and with whom JUSTICE O'CONNOR joins as to Parts I and III, dissenting.

Today the Court holds that the Sixth Amendment prohibits the use at trial of postindictment statements made to a government informant, even where those statements were recorded as part of a good-faith investigation of entirely separate crimes. Nothing whatever in the Constitution or our prior opinions supports this bizarre result, which creates a new "right" only for those possibly habitual offenders who persist in criminal activity even while under indictment for other crimes. I dissent and would reverse.

## I

Before reaching the legal issues, it is important that the factual basis on which the State acted here be clearly understood. Since the Court's opinion glosses over some of the more relevant facts, I review them here briefly.

After respondent and a codefendant, Gary Colson, were indicted on several felony counts of theft by receiving stolen goods, Colson telephoned Belfast Police Chief Robert Keating to arrange à meeting. At that meeting, on November 4, 1982, Colson told Chief Keating that he had been receiving "threatening phone calls" and that "it had gone too far." In this conversation, Colson indicated his desire to tell Chief Keating about the circumstances giving rise to the indictment; but Chief Keating appropriately cautioned him to consult with an attorney before saying more.

Two days later, Colson and respondent met. Respondent spoke of "[g]etting rid of a couple of witnesses," including Gary Elwell, a key prosecution witness in the upcoming trial of Colson and respondent. Respondent had formulated a general plan for the murder; Colson's role was to pick up a car to be used in that endeavor.

On November 9 and 10, Colson met with Chief Keating and Detective Rex Kelley of the Maine State Police at the office

of Colson's attorney. At these meetings, Colson revealed to the police respondent's plan to kill Elwell. Keating was aware that several witnesses connected with the case had received threats. One witness, Duke Ducaster, had been threatened personally by respondent. Another witness, Herman Peasley, "had been told . . . that a cup of acid could be thrown in his face" if he talked to the police. Colson then consented to having the police place a recording device on his home telephone. Keating testified that he placed the device on the telephone because respondent was to call Colson back when plans to eliminate Elwell had been finalized and because Colson himself had been receiving anonymous threatening telephone calls.

Three telephone calls initiated by respondent were subsequently recorded. In the first, on November 22, 1982, respondent, in an apparent reference to the plan to do away with Elwell, told Colson that he had "come up with a method" and that he wanted to get together with Colson to talk about it after he had "work[ed] out the details on it." In the second recorded conversation, respondent reviewed with Colson the extent of the evidence against them and made several incriminating statements. In the last of the recorded conversations, respondent again incriminated himself[1] and

---

[1] Contrary to the Court's assertion that "the conversation ended without Moulton having said anything that incriminated him," *ante*, at 164, Moulton and Colson in fact rehearsed a fabricated story that they planned to use at trial:

"[Moulton:] The parts I bought. I never denied that. I did buy those. . . .

"[Colson:] The [M]ustang . . . same here.

"[Moulton:] And the [M]ustang, we bought that?

"[Colson:] Yeah.

"[Moulton:] Ok. It's just a coincidence that ah, they happened to be . . . [h]ot or whatever. . . . You've got a bill of sale for the Mustang. I got a bill of sale for parts. So, you know, what the hell? What can they say?" Exh. S–3, Tr. of Dec. 14 Conversation 4–5.

referred to statements by witnesses that they had been threatened. Finally, respondent told Colson that he wanted to meet to "review the whole plan."

Chief Keating and Detective Kelley then arranged for Colson to wear a body recorder/transmitter during this meeting. Both officers testified that the recorder was intended to protect Colson's safety, since respondent might have learned that Colson was cooperating with the police, as well as to record any information concerning threats to other witnesses. Colson himself testified that his understanding of the reasons for using the recorder were "number 1 . . . my safety" and "number 2 . . . for any other plans to do away with any of the witnesses." When asked if there was a "number 3," Colson testified "no." The police instructed Colson "to act like himself, converse normally, and avoid trying to draw information out of Moulton."

During the meeting with Colson, respondent without any prompting brought up the possibility of killing Gary Elwell, by means of an air gun with hollow-tipped darts or explosives.[2] Respondent also suggested developing false testi-

---

[2] After a break in the conversation, respondent took a deep sigh and said:

"[Moulton:] You know I thought of a way to eliminate them. Remember we were talking about it before?

"[Colson:] Yes, you thought of a way?

"[Moulton:] Yeah, but, ah, I don't think we ought to go for it. . . .

"[Colson:] Well, let me [hear it].

"[Moulton:] Well you know those air guns. . . . They make little darts for those little feather back darts that you can put in there you've seen em. Those little darts, those little things about that long. I [was] thinking just hollow the tip out like a needle and just put . . . little . . . holes on the side, and you fill it with a lethal injection and the shooting impact would shoot all the stuff out of it into . . . the individuals body [and] poison [th]em. There would be no noise.

"[Colson:] Jesus. . . .

"[Moulton:] That's the only thing that runs through my brain . . . you have a puncture wound, probably take about 20 or 30 minutes to kick off,

mony for presentation at trial. These portions of the transcript were not admitted into evidence at trial. In addition, there was direct discussion of the thefts for which respondent had been indicted; these portions of the transcript were admitted. The trial court refused to suppress these portions since the State had recorded the conversations "for legitimate purposes not related to the gathering of evidence concerning the crime for which [respondent] had been indicted—*i. e.*, in order to gather information concerning the anonymous threats that Mr. Colson had been receiving, to protect Mr. Colson and to gather information concerning [respondent's] plans to kill Gary Elwell." The Maine Supreme Court in a careful opinion found "ample evidence" to support this factual finding.

## II

The Court today concludes that "[t]o allow the admission of evidence obtained from an accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance . . . risks the evisceration of the Sixth Amendment right recognized in *Massiah*." *Ante*, at 180. With all deference I am bound to state that this conclusion turns the Sixth Amendment on its head by first positing a constitutional violation and then asking whether "alternative, legitimate reasons" for the police surveillance are sufficient to justify that constitutional viola-

---

yeah, and the other problem is the poison, where . . . are you going to get some poison? Small bottles.

"[Colson:] What was that stuff you told me about once?

"[Moulton:] Calcium chlorine . . . , yeah, something like that, just a small drop will make you look like you have a heart attack and . . . you'd never, never, find it unless you were looking . . . exactly for that drug. . . . Stops your heart." Exh. S–4, Tr. of Dec. 26 Meeting 18–20.

Moulton then discussed an alternative scheme for doing away with witnesses, based on making explosives pursuant to directions contained in a magazine that one of his "best friends" was sending. Moulton described him as having belonged to "a motorcycle gang" and also suggested ominously that he had "[p]robably snuffed one or two people." *Id.*, at 21.

tion.   As I see it, if "alternative, legitimate reasons" motivated the surveillance, then no Sixth Amendment violation has occurred.   Indeed, if the police had failed to take the steps they took here knowing that Colson was endangering his life by talking to them, in my view they would be subject to censure.

Analysis of this issue must begin with *Hoffa* v. *United States*, 385 U. S. 293 (1966), not cited in the Court's opinion. In *Hoffa*, the Court held that postindictment statements obtained by a Government informant "relat[ing] to the commission of a quite separate offense," *id.*, at 308, were properly admitted at a subsequent trial for the separate crime.   Other courts have also held that *Massiah*, viewed in light of the later-decided *Hoffa* case, does not prohibit the introduction of incriminating statements obtained in good faith by the Government even after an indictment at a trial involving an offense different from that covered by the indictment.   See, *e. g.*, *Mealer* v. *Jones*, 741 F. 2d 1451, 1455 (CA2 1984), cert. denied, 471 U. S. 1006 (1985); *United States* v. *Lisenby*, 716 F. 2d 1355, 1357–1359 (CA11 1983) (en banc).

Applying *Hoffa* to the facts of this case, it is clear that the statements obtained by Colson could have been introduced against respondent at a subsequent trial for crimes apart from those for which respondent had already been indicted, such as conspiracy to commit murder or to obstruct justice. The majority concedes as much: "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Ante*, at 180, n. 16.   It follows from this that the State engaged in no impermissible conduct in its investigation of respondent based on Colson's revelations.   By recording conversations between respondent and Colson, Chief Keating and Detective Kelley succeeded in obtaining evidence that the Court's opinion concedes could have been used to convict respondent of further crimes.   In fact this record shows clearly that, based on the recordings, the State

was able to obtain additional indictments against respondent for burglary, arson, and three more thefts. The Court's opinion notes that respondent pleaded guilty to several of the additional indictments secured as a result of pursuing Colson's leads. *Ante,* at 167.

Courts ought to applaud the kind of careful and diligent efforts of the police shown by this record. Indeed, the Court's opinion does not suggest that the police should have—or could have—conducted their investigation in any other way. Yet, inexplicably, the Court holds that the highly probative and reliable evidence produced by this wholly legitimate investigation must be excluded from respondent's trial for theft. The anomaly of this position, then, is that the evidence at issue in this case should have been excluded from respondent's theft trial even though the *same evidence* could have been introduced against *respondent himself* at a trial for separate crimes. Far from being "a sensible solution to a difficult problem," *ante,* at 179, as the Court modestly suggests, it is a judicial aberration conferring a windfall benefit to those who are the subject of criminal investigations for one set of crimes while already under indictment for another. I can think of no reason to turn the Sixth Amendment into a "magic cloak," *United States* v. *DeWolf,* 696 F. 2d 1, 3 (CA1 1982), to protect criminals who engage in multiple offenses that are the subject of separate police investigations.

We have held that no Sixth Amendment violation occurs unless the State "deliberately elicit[s]" comments from the defendant. See *Massiah* v. *United States,* 377 U. S. 201, 206 (1964); *United States* v. *Henry,* 447 U. S. 264, 270 (1980). As the foregoing amply demonstrates, however, a finding of "deliberate elicitation" is not the end of the inquiry. In using the phrase "deliberate elicitation," we surely must have intended to denote elicitation for the purpose of using such statements against the defendant in connection with charges for which the Sixth Amendment right to counsel had attached. Here the State indeed set out to elicit information

from a defendant, but it was an investigation with respect to crimes other than those for which the defendant then stood indicted. As two courts found, the State recorded the conversations "'for legitimate purposes not related to the gathering of evidence concerning the crime for which [respondent] had been indicted.'" 481 A. 2d 155, 160 (Me. 1984) (quoting trial court).

No prior holding of this Court recognizes a Sixth Amendment violation in such circumstances. As one court has put it, the Sixth Amendment "speaks only to the situation where in the absence of retained counsel, statements are deliberately elicited from a defendant in connection with a crime for which he has already been indicted." *United States* v. *Hinton*, 543 F. 2d 1002, 1015 (CA2), cert. denied *sub nom. Carter* v. *United States*, 429 U. S. 980 (1976).[3] Thus, in *United States* v. *Henry, supra*, at 275, n. 14, we quoted Disciplinary Rule 7–104(A)(1) of the American Bar Association's Code of Professional Responsibility, which provides that "'a lawyer shall not . . . [c]ommunicate or cause another to communicate *on the subject of the representation* with a

---

[3] The Court's opinion seems to read *Massiah* as if it definitively addresses situations where the police are investigating a separate crime. This reading is belied by the *Massiah* Court's statement of its own holding: "We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents *under the circumstances here disclosed,* could not constitutionally be used by the prosecution as evidence against *him* at his trial." *Massiah* v. *United States*, 377 U. S. 201, 207 (1964) (first emphasis added).

The reference to the "circumstances here disclosed" must be to the fact that the Government, far from pursuing a good-faith investigation of different crimes, had "instructed the informant to engage [Massiah] in conversation relating to the crimes [for which he had already been indicted]." *United States* v. *Henry*, 447 U. S. 264, 276 (1980) (POWELL, J., concurring); Brief for Petitioner in *Massiah* v. *United States*, O. T. 1963, No. 199, p. 4.

party he knows to be represented by a lawyer in that matter'" (emphasis added). Our reference in *Henry* to this rule illustrates that we have framed the Sixth Amendment issue in terms of whether the State deliberately circumvented counsel with regard to the "subject of representation." But where, as here, the incriminating statements are gathered for "an alternative, legitimate reason," *ante*, at 180, wholly apart from the pending charges, no such deliberate circumvention exists.

The Court's opinion seems to rest on the notion that the evidence here is excludable because "the State 'must have known' that its agent was likely to obtain incriminating statements from the accused," *ante*, at 176, n. 12, with respect to the crimes for which he was already indicted. But the inquiry mandated by our holdings is whether the State recorded the statements not merely *in spite of*, but *because of* that consequence. Cf. *Wayte* v. *United States*, 470 U. S. 598 (1985). If the State is not seeking to elicit information with respect to the crime for which the defendant is already indicted, it cannot rationally be said that the State has "planned an impermissible interference with the right to the assistance of counsel." *Henry*, *supra*, at 275.

This case is a particularly inappropriate one for invoking the right to counsel. The right to counsel recognized in *Massiah* was designed to preserve the integrity of the trial. See 377 U. S., at 204. Here respondent was under investigation because of his plans to obstruct justice by killing an essential witness. There is no right to consult an attorney for advice on committing crimes. See *United States* v. *Merritts*, 527 F. 2d 713, 716 (CA7 1975). Indeed, any attorney who undertook to offer such advice would undoubtedly be subject to sanction. Disciplinary Rule 7–102(A)(7) of the Code of Professional Responsibility, for example, states "a lawyer shall not . . . [c]ounsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent." Thus there is no warrant for vindicating respondent's right to con-

sult counsel. An observation of this Court in connection with the attorney-client evidentiary privilege bears mention here: "The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Clark* v. *United States*, 289 U. S. 1, 15 (1933). I would let the truth be told in this case rather than exclude evidence that was the product of this police investigation into activities designed to thwart the judicial process.

Even though the *Massiah* rule is inapplicable to situations where the government is gathering information related to a separate crime, police misconduct need not be countenanced. Accordingly, evidence obtained through a separate crimes investigation should be admitted only "so long as investigating officers show no bad faith and do not institute the investigation of the separate offense as a pretext for avoiding the dictates of *Massiah*." *United States* v. *Darwin*, 757 F. 2d 1193, 1199 (CA11 1985). Here the careful actions of Chief Keating and Detective Kelley steered well clear of these prohibitions.

Until today, the clearly prevailing view in the federal and state courts was that *Massiah* and its successors did not protect a defendant from the introduction of postindictment statements deliberately elicited when the police undertook an investigation of separate crimes.[4] As two leading commentators have observed:

---

[4] See *United States* v. *DeWolf*, 696 F. 2d 1, 3 (CA1 1982); *Grieco* v. *Meachum*, 533 F. 2d 713, 717–718 (CA1 1976), cert. denied *sub nom. Cassesso* v. *Meachum*, 429 U. S. 858 (1976); *United States* v. *Hinton*, 543 F. 2d 1002, 1015 (CA2), cert. denied *sub nom. Carter* v. *United States*, 429 U. S. 980 (1976); *United States* v. *Merritts*, 527 F. 2d 713, 716 (CA7 1975); *United States* v. *Taxe*, 540 F. 2d 961, 968–969 (CA9 1976), cert. denied, 429 U. S. 1040 (1977); *United States* v. *Darwin*, 757 F. 2d 1193, 1200 (CA11 1985); *Crawford* v. *State*, 377 So. 2d 145, 156 (Ala. Crim. App.), aff'd, 377 So. 2d 159 (Ala. 1979), vacated and remanded, 448 U. S. 904 (1980); *Deskins* v. *Commonwealth*, 512 S. W. 2d 520, 526 (Ky. 1974), cert. denied, 419 U. S. 1122 (1975); *Hall* v. *State*, 47 Md. App. 590, 596, 425 A. 2d 227,

"Even before [*Brewer* v.] *Williams*, [430 U. S. 387 (1977),] it was generally accepted that the right to counsel did not bar contact with the defendant concerning *other offenses*, particularly if the offenses were clearly unrelated and it did not appear the charge was simply a pretext to gain custody in order to facilitate the investigation. The more recent cases recognize that [*Massiah* and its progeny do] not confer upon charged defendants immunity from investigation concerning other crimes. This is especially true when the offense under investigation is a new or ongoing one, such as illegal efforts to thwart the forthcoming prosecution." 1 W. LaFave & J. Israel, Criminal Procedure § 6.4, p. 470 (1984) (emphasis added) (footnotes omitted).

Rather than expand *Massiah* beyond boundaries currently recognized, I would take note of the observation that "*Massiah* certainly is the decision in which Sixth Amendment protections have been extended to their outermost point." *Henry*, 447 U. S., at 282 (BLACKMUN, J., dissenting). I would not expand them more and well beyond the limits of precedent and logic.

## III

Even if I were prepared to join the Court in this enlargement of the protections of the Sixth Amendment, I would have serious doubts about also extending the reach of the exclusionary rule to cover this case. "Cases involving Sixth Amendment deprivations are subject to the general rule that

---

231 (1981), aff'd, 292 Md. 683, 441 A. 2d 708 (1982); *People* v. *Mealer*, 57 N. Y. 2d 214, 218, 441 N. E. 2d 1080, 1082 (1982); *People* v. *Costello*, 101 App. Div. 2d 244, 247, 476 N. Y. S. 2d 210, 212 (1984); *Hummel* v. *Commonwealth*, 219 Va. 252, 257, 247 S. E. 2d 385, 388 (1978), cert. denied, 440 U. S. 935 (1979). Cf. *United States* v. *Moschiano*, 695 F. 2d 236, 243 (CA7 1982), cert. denied, 464 U. S. 831 (1983); *United States* v. *Boffa*, 89 F. R. D. 523 (Del. 1981). But see *Mealer* v. *Jones*, 741 F. 2d 1451, 1455 (CA2 1984), cert. denied, 471 U. S. 1006 (1985); *State* v. *Ortiz*, 131 Ariz. 195, 202, 639 P. 2d 1020, 1028 (1981), cert. denied, 456 U. S. 984 (1982).

remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States* v. *Morrison,* 449 U. S. 361, 364 (1981). Application of the exclusionary rule here makes little sense, as demonstrated by "weighing the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence." *United States* v. *Leon,* 468 U. S. 897, 907 (1984).

With respect to the costs, applying the rule to cases where the State deliberately elicits statements from a defendant in the course of investigating a separate crime excludes evidence that is "typically reliable and often the most probative information bearing on the guilt or innocence of the defendant." *Stone* v. *Powell,* 428 U. S. 465, 490 (1976). Moreover, because of the trustworthy nature of the evidence, its admission will not threaten "the fairness of a trial or . . . the integrity of the factfinding process." *Brewer* v. *Williams,* 430 U. S. 387, 414 (1977) (POWELL, J., concurring). Hence, application of the rule to cases like this one "deflects the truthfinding process," "often frees the guilty," and may well "generat[e] disrespect for the law and [the] administration of justice." *Stone* v. *Powell, supra,* at 490–491.

Against these costs, applying the rule here appears to create precious little in the way of offsetting "benefits." Like searches in violation of the Fourth Amendment, the "wrong" that the Court condemns was "fully accomplished" by the elicitation of comments from the defendant and "the exclusionary rule is neither intended nor able to cure the invasion of the defendant's rights which he has already suffered." *Leon, supra,* at 906 (internal quotation omitted).

The application of the exclusionary rule here must therefore be premised on deterrence of certain types of conduct by the police. We have explained, however, that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some

right." *United States* v. *Peltier,* 422 U. S. 531, 539 (1975). Here the trial court found that the State obtained statements from respondent "for legitimate purposes not related to the gathering of evidence concerning the crime for which [respondent] had been indicted." Since the State was not trying to build its theft case against respondent in obtaining the evidence, excluding the evidence from the theft trial will not affect police behavior at all. The exclusion of evidence "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Leon, supra,* at 919. Indeed, as noted above, it is impossible to identify any police "misconduct" to deter in this case. In fact, if anything, actions by the police of the type at issue here should be encouraged. The diligent investigation of the police in this case may have saved the lives of several potential witnesses and certainly led to the prosecution and conviction of respondent for additional serious crimes.

It seems, then, that the Sixth Amendment claims at issue here "closely parallel claims under the Fourth Amendment," *Brewer, supra,* at 414 (POWELL, J., concurring), where we have found the exclusionary rule to be inapplicable by weighing the costs and benefits of its applications. See, *e. g., United States* v. *Leon, supra* (exclusionary rule inapplicable where officers rely in good faith on defective search warrant issued by neutral magistrate); *Stone* v. *Powell, supra* (where full opportunity to litigate Fourth Amendment issues has been afforded, such issues may not be raised in a state habeas petition). If anything, the argument for admission of the evidence here is even stronger because "[t]his is not a case where . . . 'the constable . . . blundered.'" *United States* v. *Henry, supra,* at 274–275 (quoting *People* v. *DeFore,* 242 N. Y. 13, 21, 150 N. E. 585, 587 (1926) (Cardozo, J.)).

Because the Court today significantly and unjustifiably departs from our prior holdings, I respectfully dissent.