**Toni CATO–RIGGS, Petitioner–Appellant,**

v.

**Joan YUKINS, Warden, Respondent–Appellee.**

No. 01–1505.

United States Court of Appeals, Sixth Circuit.

Sept. 13, 2002.

Before SURHEINRICH and BATCHELDER, Circuit Judges, and LITTLE, District Judge.*

LITTLE, JR., District Judge.

Toni Cato–Riggs ("Appellant") appeals denial of her petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Michigan. Appellant was convicted of first-degree premeditated murder and conspiracy to commit murder in 1994. She is a state prisoner. The sole basis for her petition is that she was denied her Sixth Amendment right to counsel in connection with the 1994 conviction. The district court denied Appellant's petition on 13 March 2001. For the reasons that follow, we AFFIRM the district court's decision.

## I. BACKGROUND & PROCEDURAL HISTORY

Appellant's conviction stems from the shooting death of her husband, Anthony Riggs, in 1991. The Michigan Court of Appeals provides a detailed description of the relevant facts in *People v. Riggs*, 223 Mich.App. 662, 665–75, 568 N.W.2d 101 (1997). This court will assume familiarity with the factual description provided by the Michigan Court of Appeals. We will only recount the most salient facts for disposition of this appeal.

In March 1991, Appellant's husband was shot to death in Detroit, Michigan. Charges of first-degree premeditated murder, *inter alia*, were filed against the Appellant, and she retained an attorney for representation in the matter. At the April 1991 preliminary examination of charges, the 36th district court found "insufficient evidence" had been presented and dismissed the charges against Appellant. The prosecutor appealed this dismissal. In June 1991, the district court's decision was affirmed, but the prosecutor continued to appeal the dismissal.

In April 1992, while the prosecution's subsequent appeal of the district court's decision was pending and Appellant continued to be represented by counsel, Appellant traveled from Michigan to Texas. In Texas, she became associated with several people engaged in narcotics trafficking. As a result of this association, Appellant became the target of an undercover drug investigation.

On 23 February 1993, Appellant met in Detroit with two persons she believed to be narcotics dealers to discuss Appellant's participation in upcoming narcotics activity. These "dealers" were actually special agents Richard Crock ("Crock") and Joseph Peterson (collectively, the "Agents") of the Drug Enforcement Agency. During this meeting, which was surreptitiously videotaped by the Agents, Appellant detailed her involvement in her husband's death.

On 17 November 1993, while the prosecution's leave to appeal the dismissal of charges to the Michigan Supreme Court was pending, Crock arrested the Appellant pursuant to an arrest warrant for federal narcotics violations. Shortly after her arrest, Appellant was confronted by Crock and Sergeant William Rice ("Rice") of the Detroit Police Department. Rice was the officer in charge of the state investigation into the murder of Appellant's husband. Crock played a portion of the videotape of the 23 February 1993 meeting, wherein Appellant inculpated herself in her husband's death. After playing the videotape,

---

* The Honorable F.A. Little, Jr., District Judge for the Western District of Louisiana, sitting by designation.

Rice interviewed Appellant and obtained an additional statement concerning the murder.[1] Subsequently, a state complaint was issued, charging Appellant with, *inter alia,* first-degree premeditated murder and conspiracy to commit murder.

In the course of preliminary proceedings, Crock testified about his investigative efforts. In simplest terms, Crock testified that Appellant became a subject in an ongoing drug investigation sometime in 1992. Crock contacted Rice concerning the Appellant after Appellant became part of the investigation. At that time, Crock became aware that homicide charges had been brought against Appellant in state court, and that Rice's investigation of the Appellant was ongoing.

Crock contacted the Appellant on 23 February 1993 and arranged a meeting with Appellant. Additionally, Crock contacted Rice on or about 23 February to "formulate plans" to meet with the Appellant.

On 23 February, Crock, posing as a high-level narcotics dealer, met with Appellant in Detroit. Crock and the Appellant began to discuss past narcotics activity. In the course of this discussion, Appellant expressed concern that an associate may eventually testify against her in connection with her husband's death. After a lengthy discussion regarding Appellant's involvement in illegal narcotics, the two began to discuss possible roles that Appellant could fill in Crock's "organization." During the conversation, Appellant told Crock about the pending appeal of the murder charge, and that she was represented by counsel.

After Appellant expressed a desire to participate in Crock's narcotics operation, Crock told her that certain "concerns with her past" had to be addressed. Crock

began to discuss the death of Appellant's husband and expressed a desire to "help." Initially, Appellant stated that she had nothing to do with her husband's murder, but Crock persisted. He claimed that her story "didn't add up." After more cajoling, and a pre-planned telephone call concerning the possibility that one of Appellant's associates decided to cooperate with authorities in connection with the murder, Appellant succumbed. She confessed to formulating a plan with others to murder her husband for pecuniary gain.

Crock's primary purpose in meeting with Appellant on 23 February was to advance his drug investigation. Though not a primary goal, he also sought to induce Appellant to make statements about her husband's murder.

At trial, and over Appellant's objection, various videotapes of Appellant's conversation with Crock were played for the jury. At the conclusion of the trial, Appellant was convicted and subsequently sentenced to concurrent terms of life imprisonment without parole.

Following sentencing, Appellant filed an appeal with the Michigan Court of Appeals. She claimed, *inter alia,* that she was denied her Sixth Amendment right to counsel when the Agents questioned her about her husband's murder during the pendency of the state-initiated appeal concerning dismissal of those charges, and her incriminating videotaped statements were admitted at trial. The Michigan Court of Appeals affirmed the conviction and sentence. The Michigan Supreme Court denied Appellant's subsequent application for leave to appeal. On 11 January 1999, the United States Supreme Court denied Petition for Writ of Certiorari. On 10 January 2000, Appellant filed the instant habeas petition in the United States District Court

---

1. The trial court suppressed the statement to Rice.

for the Eastern District of Michigan. The crux of Appellant's habeas petition is same Sixth Amendment right to counsel claim raised on direct appeal. The district court denied Appellant's petition on 13 March 2001. This appeal was timely filed.

## II. STANDARD OF REVIEW

We review the district court's denial of Appellant's habeas petition *de novo*. *Fair v. United States*, 157 F.3d 427 (6th Cir. 1998). As such, we apply the standard used by the district court. Accordingly, in the instant appeal, we are limited by the narrow standard of review contained in 28 U.S.C. § 2254(d) which provides in relevant part, that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ... resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ...."

## III. ANALYSIS

Appellant principally relies on *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and its progeny in an effort to show that well-established legal principals dictate the result in this case. We disagree.

While a prolix analysis of Appellant's cases is unnecessary, it suffices to say that the we agree with the palmary analysis of the district court. After review of the matter, we too conclude that the Michigan Court of Appeals' decision is neither contrary to established United States Supreme Court precedent, nor is it an unreasonable application of that precedent. *See Williams v. Taylor*, 529 U.S. 362, 409–10,

120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Sixth Amendment right to counsel is violated when government agents surreptitiously question a criminal defendant regarding pending criminal charges in the absence of counsel and incriminating statements made by the defendant are admitted into trial. *See Maine v. Moulton*, 474 U.S. 159, 176–77, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) (concerning indicted defendant and cooperating codefendant). In this case, however, the criminal charges against the Appellant were dismissed when Crock questioned the Appellant. Several courts have held that incriminating statements obtained after dismissal of charges do not violate a defendant's Sixth Amendment protection. *See United States v. Mapp*, 170 F.3d 328, 333–34 (2d Cir.1999). For this reason, and because there is no evidence that dismissal of the charges was merely an attempt to "end run" Appellant's Sixth Amendment protection, we view the decision of the Michigan Court of Appeals not to be "unreasonable" at all. Instead, given the unique facts of this case, the decision is consistent with substantial authority. *See, e.g., United States v. Bartelho*, 129 F.3d 663, 675 (1st Cir.1997).

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court.