**Shannon Rochelle FOUX, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–93–101 CR.**

Court of Appeals of Texas,
Beaumont.

Submitted June 2, 1994.

Decided Nov. 2, 1994.

Thomas A. White, Orange, for appellant.

John Kimbrough, County Atty., Gary R. Bonneaux, Asst. County Atty., Orange, for State.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appellant, Shannon Rochelle Foux, was convicted of the felony offense of murder following a jury trial on the merits. Appellant was indicted for the offense of murder. The indictment alleged that on or about May 20, 1992, in Orange County, the appellant did then and there intentionally and knowingly cause the death of an individual, Cathy Orlando, by shooting the said Cathy with a firearm. The appellant pleaded not guilty to the indictment. The jury found the appellant guilty of the offense charged and assessed her punishment at 99 years in the Texas Department of Criminal Justice.

Appellant, with admirable candor, concedes that Cathy Orlando died as a result of a gun shot wound to her head. An investigation ensued which lead to the indictment and arrest of the appellant.

The appellant advances one point of error reading:

The trial court erred in allowing into evidence, over Appellant's objection, statements taken from the Appellant as a result of her ineffective waiver of her Sixth Amendment right to counsel, as applicable through the Fourteenth Amendment and that such error was not harmless beyond a reasonable doubt.

On or about September 25, 1992 and again on September 30, 1992, while the appellant was incarcerated as a prisoner in the Orange County Jail, the appellant allegedly gave two confessions or voluntary statements to a sheriff's deputy, one Calvin Hogg. The record is clear that each one of these statements was given while the appellant was actually represented by appointed counsel and long after the appellant had been indicted. The appellant was indicted on August 19, 1992, and on August 27, 1992, the Hon. Tommy White was appointed by the court to represent appellant. The statements took place about a month after the appellant had an attorney. At a proper time, the appellant urged her motion to suppress the statements. The trial judge ruled that the statements were admissible. The motion to suppress was denied.

The statements were marked as State's Exhibit Nos. 11 and 12 and were introduced into evidence although the appellant's attorney lodged strenuous objections. The objections were that the statements were taken in violation of the client's Fifth, Sixth, and Fourteenth Amendment rights. A further specific objection averred that the statements were taken as a result of an ineffective waiver of such rights. These several specific, "on-target" objections were overruled.

Foux was seventeen years of age. Her date of birth was March 26, 1975. The first "voluntary statement" which was dated September 25, 1992, contained some significant waivers such as Foux had the right to have a lawyer present to advise her prior to and during any questioning. She waived this but she already had an attorney appointed for her. Another seeming inconsistency is this, "If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning." But attorney White had been appointed and active in her case. Almost a month before the date of the first "voluntary statement" an attorney, White, had been appointed for her and Foux knew of the appointment.

The first statement was extremely damaging to the appellant. It proved against her interest with devastating inculpability, the fact that Foux had gone to her mother's house and was talking with her mother about Cathy. While appellant was talking to her mother, the idea of shooting Cathy entered the mind of the appellant. Then, she went to Cathy's house. Cathy was on the phone. Appellant went into the kitchen and picked up Cathy's gun off a shelf. Foux looked at the gun for a while and then went over to the couch and put the gun under the pillow and Foux fell asleep.

After a while the appellant woke up and took the gun and went into Cathy's room where Cathy was asleep. The appellant pointed the gun at Cathy's head and pulled the trigger, shooting Cathy in the head. Appellant then ran out of the room and shut the door to Cathy's room and grabbed the keys to Cathy's car and went to appellant's mother's house where the appellant told her own mother generally what had happened. The appellant then recounted in her statement some events that happened after the shooting. One of which was that after driving to Lake Charles, Foux went to a certain house of a friend "where we had the pleasure of having sex". The above narration was shown by Exhibit No. 11. Malice aforethought was established. Planning the shooting was shown. The shooting was not done on the spur of the moment.

State's Exhibit No. 12 was perhaps even more damaging to appellant. In the second statement dated September 30, 1992, the appellant added that when she and her mother began to talk about Cathy that her mother stated how she (the mother) would like to get her hands on Cathy. The appellant and the appellant's mother talked a little bit longer and the mother dropped a hint, according to the appellant, of doing away with Cathy. The appellant was reminded by her mother that if Cathy was shot, the appellant was to make sure there were no finger prints on the gun and to make the shooting look like a suicide.

After the shooting, the appellant returned to her mother's home. The appellant was asked if Cathy's kids were there. They were. The kids were in their own room. The mother asked the appellant if Cathy was dead. The appellant said, "I don't know". Then, apparently the mother told the appel-

lant that the appellant needed to go back to Cathy's house and stay there until the next morning and wait until it was time for the kids to leave for school. Then, when Cathy did not get up to go into the kids' room, the appellant was to find, with feigned surprise, Cathy shot. According to the appellant's second statement, the mother told the appellant not to talk to anyone and not to say anything to anyone. The appellant concluded the second statement with these words:

> I feel like if my mother wouldnt of hinted around about this that I wouldnt of shot Kathy. The reason I dont want my lawyer here or my mother is because I feel like my lawyer is not doing enough to help me all he does is talk to my mother and not me. My mother is getting my SSI checks and she is spending the money. She said she is going to use them to help me get out but she hasnt done that yet. [sic]

According to the record before us, the appellant failed to sign the part of State's Exhibit No. 12 reading:

> I have read this statement consisting of 2 page(s), each of which bears my signature and I do affirm that all the facts and statements contained herein are true and correct.

> The above warnings were given by and this voluntary statement was taken by [sic]

But no signature of Foux follows.

Admittedly this is a difficult case. The appellant completely signed the first statement, State's Exhibit No. 11, but did not, as we read the record and the exhibits before us, completely sign the second statement being State's Exhibit No. 12.

Although in both instances the appellant apparently initiated her request to see Sergeant Calvin Hogg, nevertheless, there was no blurting out by the appellant. However, the trial judgment is not reversed on the lack of appellant's signature on Exhibit No. 12 as noted above.

### *The Sixth Amendment Issue*

The Texas Court of Criminal Appeals has reasoned that unlike the Fifth Amendment, the Sixth Amendment guarantees more than an entitlement to counsel upon invocation.

The criminal defendant, as here, is less capable of coping with the system of criminal justice than his or her governmental opponent. Thus, the Sixth Amendment's guarantee of counsel has been regarded and recognized as being indispensable to the fair administration of our adversarial system of criminal justice.

Furthermore, the Sixth Amendment was designed to remedy imbalances in the adversary system. Importantly, the Sixth Amendment promises that an accused is entitled to defense counsel in all criminal prosecutions. U.S. CONST. amend. VI. *See and compare Holloway v. State*, 780 S.W.2d 787, 793 (Tex. Crim.App.1989). The United States Supreme Court has held that the Sixth Amendment recognizes the right to the assistance of defense counsel because such Sixth Amendment right envisions counsel's playing of a meaningful role that is pivotal to the ability of the adversarial system to produce just results. *See and compare Strickland v. Washington*, 466 U.S. 668–685, 104 S.Ct. 2052–2063, 80 L.Ed.2d 674 (1984).

Appellant, Foux, in view of the two statements necessarily and undoubtedly was in an inferior position; she was on a uneven field vis-á-vis the prosecution in her trial for murder—maybe she should have been on an uneven, disadvantageous field.

■ Furthermore, when Foux gave her very inculpatory statements, the record reveals that she waived her *Miranda* rights and her Fifth Amendment rights to counsel. But under the Sixth Amendment, the counsel's functions are different from those functions under the Fifth Amendment. The Sixth Amendment right to counsel has been extended to certain pre-trial, critical stages. The prosecution's attempts or the State's attempts to obtain and secure incriminating statements from an accused are definitely among the pre-trial phases of litigation to which the United States Supreme Court had extended Sixth Amendment protection. *Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

■ In certain custodial interrogation situations the Sixth Amendment right to counsel will be so indispensable that any waiver of

counsel will be invalid. But these cases are extremely rare. Once a defendant has an attorney, then a distinct new set of constitutional safeguards arise aimed at preserving the sanctity of the attorney-client relationship. Thus, the Sixth Amendment's very meaningful protection of the attorney-client relationship—the right of the accused to rely on counsel as a medium between the accused and the prosecution—extends beyond the *Miranda* warning and beyond the *Miranda* protection pursuant to the Fifth Amendment right to counsel. There are definite, dire, dangerous situations and cases where a waiver which would be valid under *Miranda* as to the Fifth Amendment would definitely not suffice for Sixth Amendment purposes.

▇ Paramountly, the Sixth Amendment, unlike the Fifth Amendment, protects the attorney-client relationship. The Sixth Amendment protects the right of the accused to rely upon counsel, even though the accused may be negligent as to the rights pursuant to the Sixth Amendment. Here, a month after indictment and a month after the attorney-client relationship was in place, the statements were taken. These Sixth Amendment requirements, concerns, and protection are not vitiated by the *Miranda* waivers. We perceive that the attorney's presence and his playing of his proper role would have prevented the recitation in Exhibit No. 12 reading:

> Things like if I do shoot her makes sure that there is not any finger prints on the gun. My mother said if I do that make it look like a suicide. I then left and went to Kathys house. I then returned to my mothers house after I shot Kathy and told my mother that I shot Kathy. She ask me if the kids were there and I said yes but they were in there room. She then ask if Kathy was dead and I said I dont know. She then told me I needed to go back over to Kathys house and stay there until the next morning and wait until its time for the kids to have to leave for school but when she didnt get up I went into the room and fund her shot. She told me not to talk to anyone and not to say anything to any one. [sic]

Likewise in Exhibit No. 11 the attorney's presence would have probably prevented this part:

> and then went to Lake Charles to C.M.'s house. We then left and went to a store where C. called B.T., and after that we went to B.'s house. We then left B.'s and then went back to C.'s house where we had the pleasure of having sex. [sic]

This last statement is not strictly relevant to the indicted offense.

▇ But the rights and the protection afforded by the Sixth Amendment can be waived. The record demonstrates that the appellant, in a meaningful way, initiated the meetings on September 25th and September 29th by requesting to see and speak to a deputy sheriff. The initiating of the first meeting was brought about by sending a signed, written request to see Calvin Hogg, a deputy, and also to have one Trisha Thomas also present A.S.A.P.

In State's Exhibit No. 11 the appellant stated and affirmed the fact that she requested to see Hogg on September 25, 1992, to give him a statement on the shooting of Cathy Orlando. The record before the trial judge also stated that Trisha Thomas was not an agent of the prosecution; Thomas received no favorable treatment because of her testimony.

Similarly, in State's Exhibit No. 12 the appellant again stated and apparently affirmed that she requested to see Sergeant Hogg on September 30, 1992, to talk to him about the shooting. The appellant also stated that she did not want to have her lawyer present. The appellant signed this part of her statement and stated, in relevant part, this:

> The reason I dont want my lawyer here or my mother is because I feel like my lawyer is not doing enough to help me all he does is talk to my mother and not me. My mother is getting my SSI checks and she is spending the money. She said she is going to use them to help me get out but she hasnt done that yet. [sic]

Constitutional rights and safeguards can be waived. We are constrained to conclude that

appellant waived her Sixth Amendment rights and protection twice.

■ The Texas Court of Criminal Appeals has acknowledged that an effective waiver of the right to assistance of counsel may take place if the accused initiates the contact with the police or law enforcement officials. *Baldree v. State,* 784 S.W.2d 676 (Tex.Crim.App. 1989) and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The contact or initiation by the accused also must be of a type that evinces a meaningful willingness and desire to engage in a generalized discussion about the relevant, ongoing investigation. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). Here the defendant personally initiated the contact with the law enforcement official leading to and resulting in an effective waiver. Importantly we conclude the appellant effectively waived her Fifth Amendment rights prior to the reinterrogations and prior to the voluntary statements. Appellant initiated in writing the interviews and she wanted action A.S.A.P. (as soon as possible). The devastating confessional statements plainly demonstrate that she wanted to communicate with Hogg to discuss Orlando's murder and certain matters occurring both before and after the fatal shooting of Orlando.

Even though the wording in the appellant's statements probably greatly diminished her chance for an acquittal, this wording is not a deciding factor. Even if it is to the appellant's disadvantage she had a right to elect to give a statement. Appellant also had a right to disregard the advice of her court appointed attorney. The appellant, in substance, testified that she did initiate the contacts with Hogg in order to get out of her cell and drink coffee. The district judge was well within his prerogatives to disbelieve this weak, transparent excuse.

Further, appellant's cell mate, Thomas, testified that no promises were made to the appellant and that no coercive measures were engaged by Deputy Hogg. Additionally, Thomas swore that while in the jail cell appellant admitted to Thomas that appellant had shot the victim. A proper hearing was conducted in accordance with *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

■ In such a hearing the trial judge acts as the sole judge of the weight and credibility of the witnesses. The trial bench may believe or disbelieve all or any part of the testimonies of the witnesses. Here the appellant waived her Sixth Amendment rights as well as her Fifth Amendment rights. *See and compare Michigan v. Jackson,* 475 U.S. 625, 635, 106 S.Ct. 1404, 1410, 89 L.Ed.2d 631, 641–642 (1986).

Necessarily we overrule appellant's sole point of error.

The judgment and sentence below are affirmed.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent to the affirmance of the punishment. Amazingly there does not appear to be any dispute about the law regarding the two confessions. The cases of *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Holloway v. State,* 780 S.W.2d 787 (Tex.Crim.App.1989); and *Baldree v. State,* 784 S.W.2d 676 (Tex.Crim.App. 1989), are all cited by the majority and establish the body of law involved. My disagreement comes from the majority's application of the law. Did Shannon Foux initiate the contact and was it a type of contact that evinces a willingness and desire for a generalized discussion about the ongoing investigation? *Baldree,* 784 S.W.2d at 686.

There is little doubt Shannon Foux initiated the contact on September 25, 1992. She used an internal written request form which stated, in pertinent part, "Message or request to see Calvin Hogg and have Trisha Thomas present A.S.A.P.". Although Ms. Foux testified she did not initiate the contact for the sole purpose of giving a statement, that testimony was disputed by both Deputy Hogg and Trisha Thomas. The trial judge was obligated to resolve that conflicting testimony and did so. I find no error in the admission of the September 25 confession.

There is also little doubt, in my mind, that Deputy Hogg initiated the contact on September 30, 1992. From the record:

> (Prosecutor) Okay. Explain the mechanics involved in taking the written statement from the defendant on September the 30th, 1992.
>
> (Deputy Hogg) What I basically did on that is, since she brought her mother into the confession, as far as saying that her mother was the—she knew also about the shooting, I called to have Shannon brought back up, and what I wanted to do was talk to her and get a statement from her about her mother being involved in it, so if we did decide to prosecute in any way—that's what that statement there was for.

Based on Deputy Hogg's own testimony, the September 30th statement should have been suppressed; its admission was error.

The majority characterizes this statement as "even more damaging [than the September 25th statement] to appellant." The prosecutor, in his closing argument of the punishment phase, referred to the September 30th statement:

> Consider the question of whether or not this defendant is a good candidate for probation.... Then when she gives a statement, she blames her mother. She's not accepting responsibility.

I cannot determine, beyond a reasonable doubt, that the error in admitting the September 30th statement made no contribution to the punishment. TEX.R.APP.P. 81(b)(2). Therefore, I would reverse and remand for a new trial on punishment.