IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 28, 2010

## STATE OF TENNESSEE v. KANE STACKHOUSE

**Appeal from the Criminal Court for Knox County**
**No. 85772      Richard R. Baumgartner, Judge**

**No. E2009-01669-CCA-R3-CD - Filed November 12, 2010**

The defendant, Kane Stackhouse, aggrieved of his Knox County Criminal Court jury convictions of first degree felony murder, second degree murder, and especially aggravated robbery, for which he received an effective sentence of life imprisonment plus twenty years, appeals contending that the trial court erred in overruling his motion to suppress his statements. We discern no error regarding the motion to suppress; however, we conclude, via plain error, that the trial court erred by failing to merge the second degree murder conviction into the merged convictions of first degree felony murder. Accordingly, we vacate and remand for the verdict of second degree murder to be merged into the judgment of first degree felony murder. In all other respects, the judgments of conviction are affirmed.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Vacated in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Richard R. Gaines, Knoxville, Tennessee, for the appellant, Kane Stackhouse.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County grand jury indicted the defendant for premeditated first degree murder, *see* T.C.A. § 39-13-202(a)(1) (2006), first degree murder committed in the perpetration of an attempted robbery, *see id*. § 39-13-202(a)(2), first degree murder committed in the perpetration of a robbery, *see id*., first degree murder committed in the

perpetration of an attempted theft, *see id.*, first degree murder committed in the perpetration of a theft, *see id.*, and especially aggravated robbery, *see id.* § 39-13-403. The charges stem from the November 11, 2006 shooting death of David Lindsey. The defendant was arrested on November 12, 2006, for the attempted aggravated robbery of the owner of a North Knoxville used car lot. The attempted aggravated robbery had occurred within hours of and in close proximity to the Lindsey shooting.

Prior to trial, the defendant moved to suppress his statements to law enforcement officers that were elicited while he was in custody on the unrelated attempted aggravated robbery charge. The defendant argued three bases for suppression of his statements: (1) that the coercive circumstances of his custody violated his Fifth Amendment right to counsel, (2) that his statements resulted from a violation of his Fourth Amendment rights pursuant to Tennessee Rule of Criminal Procedure 5(a) because he was not taken before a magistrate within 48 hours of his arrest, and (3) that law enforcement officers obtained his statements in violation of his Sixth Amendment right to counsel. Following a full evidentiary hearing, the trial court denied the motion to suppress after finding that the defendant's statements were not the product of a coercive environment and that his Sixth Amendment right to counsel had not attached at the time he initiated contact with the investigators.[1]

Knox County Sheriff's Office (KCSO) Deputy Jeff Cobb was responsible for processing the defendant's booking into the detention facility. He recalled that the defendant seemed "depressed, down, [and] angry." The defendant voiced his desire to commit suicide to Deputy Cobb. When asked how he would kill himself, the defendant said, "[A]ny way possible." Deputy Cobb did not give the defendant a pen to sign the booking forms because the defendant "might have done something hasty" with it. Deputy Cobb referred the defendant to the medical division for observation.

KCSO Assistant Chief Dorothy Pinkston worked as the Health Administrator in the Medical Division of the Knox County Detention Facility, and her duties included maintaining records in the medical division. She testified generally that if an inmate showed signs of suicidal ideation during booking, the inmate would be interviewed by the medical division to determine if further therapeutic measures were necessary. She said therapeutic measures may include observation of the inmate while restrained to a "therapeutic bench" until the inmate can be "stepped up" and gradually returned to the general population after the cessation of the suicidal ideation and the execution of a "no harm contract." The

---

[1] The defendant abandoned the Rule 5(a) issue at the suppression hearing. Thus, the trial court made no findings or rulings with respect to this allegation. The effect of the abandonment of this issue will be analyzed further.

therapeutic bench consisted of continuous watch via camera by the nursing staff, status checks every 15 to 20 minutes, hand and leg restraints, and, in certain cases, a "belly chain." Any inmate so restrained is "allowed to get up and if they're not acting out and fighting and carrying on, . . . [they may] go to the restroom[,] . . . . get a drink, and . . . eat."

Assistant Chief Pinkston recalled that the defendant told officers during his booking on November 12, 2006, that he had "suicidal thoughts and panic attacks." During his initial interview with the nursing staff, the defendant admitted that he had tried to hang himself "a couple days ago" and had also taken pills. In reference to the attempted aggravated robbery, the defendant told officers that he wished that the victim, who had a gun, had just shot him. Based upon these statements of intent to harm himself, the nursing staff decided to place the defendant on the therapeutic bench for observation at 8:30 a.m. on November 12. The defendant remained on the bench, except when transported for interviews with investigators, until he was "stepped up" to a therapeutic isolation cell at 3:30 p.m. on November 14.

Notes made by the staff nurses indicated that the defendant was oriented to his surroundings and circumstances throughout observation while he was on the bench. The nurses noted that the defendant was "very quiet" and did not complain, with one nurse noting that the defendant was "so quiet, you never know he's on the bench." Observation notes from November 14 at 6:15 a.m. indicated that the chief of detectives ordered no one to remove the defendant from the bench. The defendant eventually executed a no harm contract and was moved to a therapeutic room on November 14 where he remained without incident until his arraignment for the attempted aggravated robbery charge on November 15.

Assistant Chief Pinkston explained that the chief of detectives had no authority over the supervision of inmates in the medical division. She acknowledged that the defendant remained on the therapeutic bench for some time despite the fact that observation notes indicated that he did not "act out" in any way. She also admitted that the defendant should have been offered the no harm contract within 24 hours of observation and that an inmate may not be moved to the therapeutic room without executing the no harm contract.

Michael Maurer, a licensed clinical social worker with Helen Ross McNabb, testified that he was a newly-employed contract worker at the detention facility when the defendant was arrested in November 2006. He recalled that the message board in the medical division listed all of the inmates' names and that the defendant's name contained a notation indicating that the staff should not speak to the defendant without permission. He did not recall the notation indicating the directive was "per order of Chief Sexton." On November 14, the notation was gone from the board, so the staff began "stepping down" the defendant, who eventually signed the no harm contract and was placed in the therapeutic

room that day. The defendant was stepped down further and moved to the "medical pod" on November 17; but he indicated that he did not want to be placed in the general population, so he remained in the medical division for some time. Mr. Maurer agreed that the defendant's multiple movements, without incident, from the therapeutic bench for interviews indicated that he was less likely to harm himself; however, he said that the "without permission" notation prevented him from approaching the defendant with the no harm contract any sooner than November 14.

KCSO Detective Sergeant Perry Moyers responded to the scene of the Lindsey homicide at approximately 3:00 a.m. on November 11. While still on the scene at 1:30 p.m. that afternoon, he received a call concerning an attempted aggravated robbery. Because he was so close to the location of the attempted aggravated robbery, Detective Moyers went to the scene and interviewed the victim, Greg "Lumpy" Lambert, who was also a Knox County Commissioner at the time. Mr. Lambert told Detective Moyers that his assailant, later identified as the defendant, dropped his driver's license when fleeing the scene. Mr. Lambert met with a judicial commissioner that afternoon, and a warrant was issued for the defendant's arrest. The defendant was arrested the next morning. Detective Moyers decided to "rule [the defendant] out or look at him at least" as a suspect in the Lindsey homicide.

On November 12, Detective Moyers interviewed the defendant on two separate occasions. At both times, the defendant was advised of and waived his *Miranda* rights. These interviews produced no evidence used in the trial of the Lindsey homicide. On November 13, Detective Moyers interviewed the defendant again. As before, the defendant waived his *Miranda* rights prior to questioning. Like the two previous interviews, this interview produced no evidence used in the trial of the Lindsey homicide. The defendant did not request an attorney during any interview. Detective Moyers did not interview the defendant on November 14.

On November 15, the defendant was arraigned on the attempted aggravated robbery charge. By this time, the defendant was the "prime suspect" in the Lindsey homicide. Detective Moyers went to the courthouse to see if the defendant was there. While the defendant was waiting in the back hallway of the courthouse, the defendant saw Detective Moyers. The two men made eye contact, and Detective Moyers "nodded" at the defendant. The defendant told Detective Moyers that he had been trying to contact him and that he wanted to talk.

During the November 15 interview, Detective Moyers again advised the defendant of his rights, and the defendant waived his rights. During the interview, the defendant gave a full statement concerning the Lindsey homicide. The defendant confessed to shooting the victim. He directed Detective Moyers to stolen items that he had abandoned

near the scene of the shooting. He admitted stealing these items from a friend in Loudon County and from the Clinton Highway Wal-Mart.

Detective Moyers testified that the defendant never requested an attorney. He also said that the defendant was neither coerced nor threatened in any manner. Although he understood that the defendant might have been appointed counsel in the attempted aggravated robbery case during the arraignment, Detective Moyers said that he considered the investigation of that case complete by November 15 and only sought information about the Lindsey homicide on that day. He also said that the defendant initiated contact with him that morning in the courthouse hallway.

Detective Moyers' testimony at trial was consistent with his testimony at the evidentiary hearing concerning the investigation of the Lindsey homicide and the events leading to the defendant's confession. Additionally, Detective Moyers elaborated that, on November 15, the defendant told him that he wanted to talk and "just get it over with."

At the suppression hearing, the trial court ruled that "the motion to suppress [the defendant's] statements [did not] survive[] scrutiny" and denied the motion. The trial court found that the defendant was arrested for the attempted aggravated robbery and, at booking, indicated that he was "a potential danger to himself," making it appropriate for officers to place him on the therapeutic bench. The trial court also found that, after adjusting for time spent away from the detention facility, the defendant spent approximately 28 hours restrained on the therapeutic bench before being moved to the therapeutic room on November 14. The only inculpatory statement made by the defendant relative to the Lindsey homicide occurred on November 15 when the defendant had "been off the bench for in excess of 24 hours." The trial court found that the defendant initiated the conversation with Detective Moyers on November 15.

Relative to the defendant's claim that his statements were coerced due to his restraint on the therapeutic bench, the trial court ruled that

> the evidence [does not] support the conclusion that [the defendant's] will was overcome by any inappropriate or unduly lengthy type of restraint. . . . by this point in time on the 15th when he's taken to court . . . he's in a position to make knowing, voluntary statements[.] . . . [A]t each and every stage of this proceeding . . . he's read and indicates his understanding of his rights. He's told each and every time, and specifically, most importantly, on the 15th before he's interviewed, he's again read his rights and indicates an understanding of those rights and

specifically waives any rights he might have and indicates that he does want to talk and he doesn't want a lawyer at that point in time.

So I think the first prong failed, and I do not find that that would be a basis to suppress his [statement].

Relative to the defendant's claim that his Sixth Amendment rights were violated by the police taking his statement on November 15 after his arraignment and purported appointment of counsel for the attempted aggravated robbery charge, the trial court found that although the defendant's Sixth Amendment right to counsel had attached in the attempted aggravated robbery case, he had not yet been charged in the Lindsey homicide. Therefore, the trial court found that no Sixth Amendment right existed as to the Lindsey homicide. The trial court further found that the defendant initiated the contact with Detective Moyers. The trial court ruled that:

[the defendant has] not even been charged in this offense, and he's the one [who] initiates the contact. He's the one [who has] been . . . told what his rights are and makes these statements after he indicates his understanding and waiving of those rights. So I don't think there's any Sixth Amendment violation here either.

On appeal, the defendant concedes that the November 15 statement should not be suppressed "for any one specific reason" alleged, but he urges this court to reverse the trial court's ruling based upon "the cumulative effect of all three of the reasons and violations of his rights during the course of his detention from November 12[] to November 15, 2006." The State contends that the trial court correctly denied the motion to suppress for three reasons: (1) the defendant failed to establish that his November 15 statement was coerced, (2) the defendant cannot establish a violation of Rule 5(a) for a statement elicited after arraignment on an unrelated charge, and (3) the Sixth Amendment right to counsel had not attached relative to the uncharged homicide at the time of his statement.

At the suppression hearing, the State had the burden of demonstrating by a preponderance of the evidence that the defendant's statements were voluntarily, knowingly, and intelligently given. *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). The trial court is the trier of fact, and its factual findings are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988). Under

this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. *Id*.; *Daniel*, 12 S.W.3d at 423. The defendant, as the appealing party, bears the burden of establishing that the evidence preponderates against the finding of the trial court. *Odom*, 928 S.W.2d at 23; *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984); *State v. Harts*, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999).

Initially, we note that the defendant failed to argue at the evidentiary hearing that his statement should be suppressed based upon a violation of Rule 5(a) of the Tennessee Rules of Criminal Procedure. *See also State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996). Therefore, the trial court made no ruling on that basis. Accordingly, we deem this issue waived for the purpose of appellate review. *See* T.R.A.P. 36(a) (failure "to take whatever action was reasonably available to prevent or nullify the harmful effect" of an alleged error may result in the waiver of that issue on appeal); *see also State v. Mickens*, 123 S.W.3d 355 (Tenn. Crim. App. 2003) (allegation on appeal regarding the admission of evidence at trial was waived due to defendant's failure to argue the allegation at trial). Furthermore, as correctly noted by the State, the defendant's allegation of a Rule 5(a) error is misplaced because the defendant was arrested for the attempted aggravated robbery pursuant to a warrant. *See generally Huddleston*, 924 S.W.2d 666 (the defendant's rights were violated under both Rule 5(a) and the Fourth Amendment by inordinate delay in taking defendant to arraignment following a warrantless arrest).

Relative to the defendant's allegation that the circumstances of his custody rendered his November 15 statement involuntary, we are mindful of the well-settled principle that a confession must be free and voluntary, and it must neither be extracted by any sort of threats or violence nor obtained by any direct or implied promises, nor by the exertion of any improper influence or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *Kelly*, 603 S.W.2d at 728. When considering the voluntariness of a confession, this court must examine the totality of the circumstances surrounding the confession to determine "'whether the behavior of . . . law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Kelly,* 603 S.W.2d at 728 (quoting and adopting the standard set forth in *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)).

The record supports the trial court's findings concerning the voluntariness of the defendant's confession. At booking, the defendant indicated that he intended to commit

suicide and had in fact attempted suicide in the days leading up to his arrest. Law enforcement personnel and the medical staff took appropriate measures to monitor the defendant's behavior and emotional affect based upon his suicidal ideation, and the staff eventually moved the defendant to a less-restrictive environment upon the cessation of his intention to harm himself. The defendant was questioned by police on at least three occasions during his observation on the therapeutic bench. Each time, the defendant signed *Miranda* waivers after being advised of his rights and indicating an understanding of those rights; however, he made no incriminating statements concerning the Lindsey homicide during those interviews. At the time of the defendant's confession on November 15, the defendant had spent approximately 24 hours in the therapeutic room and had appeared in court for his arraignment on the attempted aggravated robbery charge. The defendant initiated contact with Detective Moyers because he wanted to "just get it over with" and talk about the Lindsey homicide. Before confessing to the shooting, he again waived his rights. We agree with the trial court that the totality of the circumstances show that the defendant's statement was given voluntarily.

Relative to the defendant's Sixth Amendment challenge, the Sixth Amendment to the United States Constitution guarantees that, "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend VI. A defendant has the right to counsel at all "'critical' stages in the criminal justice process' where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'" *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967)). The right to counsel embodied in the Sixth Amendment, however, "'attaches only at or after the initiation of adversary proceedings against the defendant . . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *United States v. Gouveia*, 467 U.S. 180, 187-88 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). This interpretation comports with the underlying purposes of the Sixth Amendment:

> That interpretation of the Sixth Amendment right to counsel is consistent not only with the literal language of the Amendment, which requires the existence of both a "criminal [prosecution]" and an "accused," but also with the purposes which we have recognized that the right to counsel serves. We have recognized that the "core purpose" of the counsel guarantee is to assure aid at trial, "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor."

*Id.* at 188-89 (quoting *United States v. Ash*, 413 U.S. 300, 309 (1973)). In Tennessee, an

arrest warrant, or a preliminary hearing if no arrest warrant precedes the hearing, or an indictment or presentment when the charge is initiated by the grand jury, marks the initiation of criminal charges after which the Sixth Amendment right to counsel attaches. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980).

In this case, the defendant had not yet been charged with the Lindsey homicide and only became a suspect in the homicide after his arrest for the attempted aggravated robbery. Therefore, no Sixth Amendment right had attached in this case. Furthermore, even if this court were to assume that the defendant was appointed counsel at his arraignment with respect to the attempted aggravated robbery, the Sixth Amendment right to counsel did not preclude police questioning relative to the uncharged and unrelated case of the Lindsey homicide. *See State v. Teel*, 793 S.W.2d 236, 244 (Tenn. 1990). Accordingly, we conclude that the trial court correctly ruled that the defendant's Sixth Amendment rights were not violated by the taking of his November 15 confession.

In summary, we conclude that the circumstances of the defendant's custody were not such that his will was overborne rendering his statement involuntary. We also conclude that the defendant waived any appellate challenge to the admissibility of his statement based upon a violation of Rule 5(a) by abandoning this argument at the evidentiary hearing. Furthermore, the defendant's Sixth Amendment right to counsel had not yet attached with respect to the Lindsey homicide at the time of his statement. Accordingly, we conclude that the cumulative effect of these alleged errors did not render his statement inadmissible and the order of the trial court denying the motion to suppress is affirmed.

We note, however, that the jury convicted the defendant of second degree murder, a lesser included offense of premeditated first degree murder; four counts of first degree felony murder; and one count of especially aggravated robbery. Upon return of the jury's verdict, the trial court merged the four felony murder convictions and imposed an automatic life sentence, *see* T.C.A. § 39-13-208(c), and the trial court set a sentencing hearing for the second degree murder and especially aggravated robbery convictions. At the sentencing hearing, the trial court stated that the second degree murder conviction should merge into the first degree felony murder conviction. Upon the assistant district attorney general's urging, however, the trial court imposed a sentence of 23 years for the second degree murder conviction to be served concurrently with the life sentence.

Although not raised by the defendant on appeal, we conclude that the trial court's failure to merge the second degree murder conviction constitutes plain error. "[W]hen only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing . . . murder will support only one judgment of conviction for [the] murder." *State v. Cribbs,* 967 S.W.2d 773, 788 (Tenn.

1998).  Accordingly, we vacate the judgment of conviction of second degree murder and remand to the trial court to merge the second degree murder verdict into the first degree felony murder conviction.  In all other respects, the judgments of the trial court are affirmed.


_____
JAMES CURWOOD WITT, JR., JUDGE