IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

March 24, 2015 Session

**STATE OF TENNESSEE v. ANTONEO WILLIAMS**

**Direct Appeal from the Criminal Court for Knox County**
**No. 100998      Bob R. McGee, Judge**

---

**No. E2014-01076-CCA-R3-CD – Filed August 25, 2015**

---

A Knox County Criminal Court Jury convicted the appellant, Antoneo Williams, of attempted second degree murder, two counts of aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment. The jury also found him to be a criminal gang member who committed criminal gang offenses, resulting in enhanced punishment for his attempted murder and aggravated assault convictions, and the trial court sentenced him to an effective sentence of fifty-three years in confinement. On appeal, the appellant contends that the evidence is insufficient to support his convictions; that the trial court erred by denying his motion to suppress his audio-recorded conversation with a fellow jail inmate, who was acting as a government agent; and that the trial court erred by using his juvenile criminal history to enhance his offender classification. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT L. HOLLOWAY, JR., JJ., joined.

Jonathan S. Wood, Knoxville, Tennessee, for the Appellant, Antoneo Williams.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## I. Factual Background

Michael Mayes of Knox County 911 testified that on June 5, 2012, the 911 center received calls about a shooting. The State played the audio-recorded calls for the jury. During the first call, which was recorded at 3:31 p.m., a woman reported that she was stopped at a stoplight at the intersection of Martin Luther King Avenue and Chestnut Street when shots "rung out." She said that she that she heard "Celos" and four gunshots, that the shots were directed at three African-American "boys," and that the boys ran behind "the old drycleaners." She said that the gunshots were coming from the "side of the store" and that "the guy getting shot at he fell but got up and starting running." She stated that the boys were "getting ready to shoot back" but ran away. One of them was wearing a brown shirt, one was wearing a black shirt, and one was wearing a red shirt. She said a window at a business on Martin Luther King had been "shot out." During the second call, which was recorded at 3:34 p.m., a man reported that some "guys" shot out the window of his business and that "they coming through the alley right now, all three of them." He stated that "I'm chasing the guys right now" and that "the one with a red shirt" had a gun.

Nineteen-year old Carlos Bennett testified that on June 5, 2012, he was walking on Martin Luther King Avenue in Knoxville with Barry McRae and Kaleb McClanhan[1] and heard someone call his nickname, "Celo." He said he turned around and "heard some shots go off." He said that he had been shot previously, that he looked down at his chest, and that he "took off running." At first, Mr. Bennett said that he saw the appellant, who was sitting in a car, shooting at him and that he heard two or three gunshots. However, he then stated that he did not see the appellant firing the gun. He said he did not remember telling a police officer that the appellant was the shooter. The State played an audio-recording of Mr. Bennett's conversation with an officer. After the State played the recording, Mr. Bennett acknowledged telling the officer that the appellant shot at him.

On cross-examination, Mr. Bennett testified that he did not see the appellant shooting and that someone told him the appellant was the shooter. He said that on the day of the shooting, he was wearing a black shirt and that no one was wearing a red shirt. He estimated that the car was twenty-five to thirty yards away at the time of the shooting but acknowledged that it could have been thirty to fifty yards away. He also acknowledged that he did not want to testify against the appellant and was doing so under subpoena.

---

[1] In the trial transcript, the victims' last names are spelled McCray and McClanahan. However, we have chosen to spell them as they appear in the indictment.

On redirect examination, Mr. Bennett testified that he ran because "I didn't want to get hit, especially if I ain't got mine on me." He said that if he had had his gun, "it would have been two different stories."

Twenty-one-year-old Mackenzie Coleman testified that in June 2012, she was dating Rodney Miller and staying with the Miller family. Rodney[2] lived in an apartment in Morningside Hills in East Knoxville with his mother, who had a black Nissan Maxima, and his brother, James. She said that she knew the appellant as "Tone," that the appellant was Rodney's friend, and that the appellant "would come there some nights and maybe leave the next day and then come back again." Ms. Coleman acknowledged that she was testifying against the appellant under subpoena.

Ms. Coleman testified that on June 5, 2012, she was supposed to have an interview at KFC on Western Avenue. She left for the interview driving the black Maxima, and Rodney, James, and the appellant rode with her. She said that Rodney was sitting in the front passenger seat, that James was sitting behind Rodney, that the appellant was sitting behind her, and that "we were just riding around I guess until the interview." Ms. Coleman said that as she was driving on Martin Luther King Avenue, she saw three "boys" walking. One of them was Carlos Bennett, and the appellant told her to stop the car. She asked why, and the appellant said that "it's Athens Park." She stopped the car, the appellant got out, and the appellant started shooting. The appellant fired the gun three times. She stated that she did not know the appellant was going to shoot at anyone and that she drove to a park. She was mad and upset after the shooting because she was trying to obtain custody of her infant son at the time.

Ms. Coleman testified that she, Rodney, James, and the appellant left the park and returned to the Miller apartment. The police arrived, and she talked with them but denied knowing anything about the shooting. However, she ultimately told them that the appellant "started shooting." On June 18, 2012, the police showed her a photograph array, and she identified the appellant's photograph.

On cross-examination, Ms. Coleman testified that she looked in her rearview mirror just before the shooting. She saw the three boys turn around and face the back of the Maxima. She could see the sides of their faces and that Mr. Bennett was wearing a white shirt. She acknowledged that after she, Rodney, James, and the appellant left the park, she drove to her interview at KFC. The three males waited in the car during her interview.

---

[2] Because Rodney and James Miller share a surname, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

Officer Joey Whitehead of the Knoxville Police Department (KPD) testified that on June 5, 2012, he responded to a shooting in East Knoxville. A man had reported that "his business had been shot" and that he was following the possible suspects toward Magnolia Avenue. Officer Whitehead made contact with the suspects at the corner of Magnolia and Olive Street, questioned them, and determined that they were the victims of the shooting. The police began looking for a dark-colored Nissan Maxima, and Officer Whitehead's supervisor learned of a possible location for the car. Officer Whitehead went to the Morningside Apartments, and his supervisor walked through the apartment complex and found the car's owner. Officer Whitehead said that he saw the car and that the appellant and Rodney Miller were inside it. Officer Whitehead spoke with Rodney, Rodney's mother, and Mackenzie Coleman. He said that the appellant "fled" from the Maxima. Officer Whitehead's supervisor found a shell casing in plain view in a driver-side door panel, and Rodney's mother gave the officers permission to search the car.

On cross-examination, Officer Whitehead testified that the appellant did not violate any law by leaving the Maxima. He acknowledged that the appellant "just walked away" and that the appellant had every right to do so.

Danielle Wieberg, an evidence technician for the KPD, testified that on June 5, 2012, she received a call about the shooting and arrived at the scene about 4:30 p.m. She photographed a damaged window and collected a small piece of "brass" that appeared to be "the fragment of the jacket that had peeled off the bullet." The fragment was on the ground directly in front of the broken window. She said the lead from the bullet "was almost completely flattened and sitting inside between the panes of glass that it had hit." About 9:00 p.m., Ms. Wieberg was called to an address where officers thought they had located the car involved in the shooting. When she arrived, officers had collected a .38 Special bullet casing from the car and an unfired 357 cartridge from an apartment.

On cross-examination, Ms. Wieberg testified that a revolver could fire both a .38 Special cartridge and a 357 cartridge. On redirect examination, she testified that casings remained inside a revolver but were ejected from semi-automatic firearms. She did not recover any casings at the scene of the shooting.

Ira Grimes testified that in June 2012, he owned a business on Martin Luther King Avenue. On the afternoon of June 5, Mr. Grimes was inside his store with four people. He said that he heard "a loud boom," that he went outside, and that he saw three males "running on the side of the building." Mr. Grimes, thinking that the males had done "something they shouldn't have," ran after them. He caught up with them, called 911, and waited for the police to arrive. He said that a bullet had broken his window and that the window saved his life because the bullet "could have very easily hit me, [or] the chair

that I was sitting in when I heard the boom." The State asked the appellant to stand, and Mr. Grimes said that he did not know the appellant.

On cross-examination, Mr. Grimes testified that he heard only one gunshot. He said he did not see the shooter and "took it upon myself to think it was the guys that was on the side of the building." When the police arrived, they arrested two of the males. Mr. Grimes said he did not get close enough to see if any of the males was carrying a gun. The State played an audio-recording of Mr. Grimes talking with a police officer, and Mr. Grimes acknowledged telling the officer that one of the males had a gun. He explained to the jury, "I felt like when they made a move, somebody made a move . . . like they might have had a gun and I stopped pursuit right then." A couple of days after the shooting, Carlos Bennett came to Mr. Grimes's store and apologized, telling Mr. Grimes that he "[d]idn't mean to bring no trouble" to Grimes. Mr. Bennett told Mr. Grimes that he was not the shooter, that he was just walking down the street at the time of the shooting, and that he did not have any money to replace the broken window. Mr. Grimes accepted Mr. Bennett's apology.

William Phillips testified that in April 2013, he and the appellant were inmates at the Knox County Detention Facility. Mr. Phillips said that he had been working with the KPD on a "cold" case that had nothing to do with the appellant, that he wore an audio-recorder, and that he turned on the recorder every time he left his cell. Mr. Phillips stated that on April 29, 2013, the appellant "called [Phillips] over to his cell" and that the appellant "started talking about his case." Mr. Phillips said that he asked the appellant "what he did" and that the appellant told him "what he had done." He asked if the appellant had hurt anyone, and the appellant said, "[N]o, I didn't hit a thing." Mr. Phillips gave the recording to Detective Jeff Day.

The State played the recording for the jury. On the recording, the appellant said, "You seem like you know a little bit about the law, man." Mr. Phillips stated, "I ain't no damn lawyer." The appellant asked Mr. Phillips about waiving a preliminary hearing, and Mr. Phillips stated, "I guess it depends on what you're here for, and I typically don't ask. What's your deal?" The appellant said he was being held on an attempted murder charge and asked, "You think they will dismiss it?" Mr. Phillips stated, "That I don't know. . . . [W]hat have they got on ya?" The appellant told Mr. Phillips that he shot but missed, that he hit a window, and that nobody got hurt.

On cross-examination, Mr. Phillips testified that he was not expecting anything from the State in exchange for his testimony and that "I've been told from my attorney that there will be nothing offered for this." He acknowledged that he had cooperated with the State "on other matters" and that he agreed to plead guilty in exchange for a sentence of one year in jail and nine years on probation. He said, though, that he entered the

agreement "back last January and all of this took place after the fact." He said that he never initiated any questions with the appellant and that "I followed up with the questions that he asked me."

Mr. Phillips testified that he had other conversations with the appellant and that he did not remember any of them being about the appellant's case. He said that at the beginning of his conversation with the appellant on April 29, the appellant said he wanted to talk with Mr. Phillips because Mr. Phillips may know something about the law. Mr. Phillips told the appellant that he was not a lawyer, but the appellant "continued to ask questions." Mr. Phillips said he thought the appellant was being truthful about the facts of the case because "[he] had no reason to lie to me."

Detective Jeff Day of the KPD testified that he gave Mr. Phillips a recording device and that he did not know the appellant on April 29, 2013. Mr. Phillips returned the device to Detective Day, and Detective Day "downloaded" Mr. Phillips's conversation with the appellant.

Fifteen-year-old James Miller testified for the appellant that he knew the appellant "from around the way." On the day of the shooting, James was "riding around" with Mackenzie Coleman. They saw the appellant and stopped to give him ride. Ms. Coleman was driving, James was sitting in the rear passenger seat, and the appellant was sitting behind Ms. Coleman. James's brother, Rodney, was not present.

James testified that while they were stopped at the intersection of Martin Luther King and Chestnut, they saw some people "mugging" the car. He said that by "mugging," he meant that they were looking at the car "in a mean way." The appellant got out of the car and said, "[W]hat's up." James said that he did not know if an argument or an altercation was in progress but that the appellant "tensed up." James said that he heard gunshots but that the shots did not sound like they came from the appellant because "if it was close to me, you know, I would have had sound effects in my ear going off."

On cross-examination, James testified that the shooting occurred after Coleman's job interview and that one of the three people he saw on Martin Luther King was Carlos Bennett. James said he was worried that one of them was going to shoot at the car because "where I'm from if you're mugging, that means you are fixing to do something." The appellant told Ms. Coleman to stop the car, and James heard the appellant say "Celos." James said that he thought Celos was the appellant's "homey" and that "[n]ext thing I know I hear shots." James heard four gunshots and ducked down. He said he did not hear the appellant say, "Athens Park."

- 6 -

James testified that after the shooting, Ms. Coleman drove to the apartment in Morningside Hills. They told Rodney Miller what had happened and went to a park. Later that day, James gave a statement to the police in which he said that he, the appellant, and Ms. Coleman left the apartment together before the shooting, not that he and Ms. Coleman picked up the appellant. He also told the police that the appellant "said Celos and then went boom, boom, boom." He acknowledged that his statement to the police differed from his testimony but said that he was scared when he talked to the police. He also acknowledged that the day before trial, he told the assistant district attorney general that he was asleep in the car and was awakened by gunshots. He said he lied to her because "I didn't want to tell you nothing in order to keep it real. I just didn't want to tell you nothing." He said he did not know the identity of the shooter "[b]ecause it happened so fast."

Rodney Miller testified under subpoena that at the time of the shooting, he was at home in Morningside Hills. He said that on the evening of June 5, 2012, he told the police that he was not in the car at the time of the shooting. However, the police started "confusing" him, so he "just kind of got scared and lied" and said he was present. He said he learned about the shooting when "everybody got home . . . they let me know what happened." He acknowledged that on the evening of June 5, a police officer saw him and the appellant in the Maxima at the apartment complex. However, he maintained that he was not in the car when the shooting occurred.

On cross-examination, Rodney testified that at the time of the shooting, he had known the appellant about one month. He acknowledged telling the police that the appellant was the shooter and that his account sounded like he witnessed the shooting. He said he had learned about the shooting from the appellant. According to the appellant, the car stopped; the appellant said, "Celos"; Celos put his hands up; and the shooting started. The State asked if the appellant began shooting at Celos, and Rodney answered, "I guess both of them from what I was told."

The twenty-year-old appellant testified that he was in the Maxima on June 5, 2012, but that he did not shoot at Bennett. The appellant said that on that day, he, Rodney Miller, and James Miller rode with Mackenzie Coleman to her interview at KFC. When they left KFC, Ms. Coleman was driving the Maxima, the appellant was sitting behind her, Rodney was sitting in the front passenger seat, and James was sitting behind Rodney. Ms. Coleman turned onto Martin Luther King, and they saw three males, one of whom was Mr. Bennett. Rodney told Ms. Coleman to stop, Rodney got out of the car, and Rodney shot at Mr. Bennett. Rodney then got back into the car, and Ms. Coleman drove to the Morningside Apartments. When they arrived, Rodney's mother came outside and told Rodney that the police wanted to speak with him. The appellant left because he had a warrant for a probation violation. At some point, a detective

interviewed the appellant. The appellant told the detective that he did not know Rodney or anything about the shooting.

The appellant testified that after his arrest in this case, he asked William Phillips for legal advice and that Mr. Phillips questioned him about his case. The appellant said that he had several conversations with Mr. Phillips, that he told Mr. Phillips "different stories every time," and that he told Mr. Phillips "anything" because other inmates were "trying to size [him] up."

On cross-examination, the appellant testified that in May 2012, he was living "everywhere" because his grandmother had evicted him from her home. The appellant met Rodney and stayed at the Miller apartment when Rodney's mother was at work. While the appellant was there, he saw one or two guns, and one of them was a revolver that he thought Rodney used during the shooting. The appellant said that at the time of the shooting, he had not seen Mr. Bennett since 2007. He said that he "ran with" the Athens Park Bloods and that he "had no clue" Mr. Bennett was a member of the Crips gang. The appellant acknowledged that he had "CK" tattooed on his face and that "CK" stood for "crip killer." He said, though, that he got the tattoo "a long time ago" and that "just because I got that on my face doesn't mean that I hate crips, no, that's not what it mean, not at all." He acknowledged that as a general rule, Bloods did not like Crips. However, he stated that he did not hate Crips and that "I run with a number of crips. I just didn't hang around them every day." He denied having a gun on June 5, 2012, but said Rodney had one. The appellant said Rodney was a member of the Bloods, not the Athens Park Bloods.

The appellant acknowledged that he initiated the April 29 conversation with Mr. Phillips and that he told Mr. Phillips that he shot at Mr. Bennett but missed and hit a window. He said that he had thought Rodney was his friend and that he had planned to take the "rap" for Rodney but changed his mind. The appellant acknowledged having a prior conviction for criminal impersonation, receiving "write-ups" in jail, and pleading guilty to the "write-ups."

The jury convicted the appellant as charged of the attempted second degree murder of Carlos Bennett, a Class B felony; the aggravated assaults of Barry McRae and Kaleb McClanhan, Class C felonies; employing a firearm during the commission of a dangerous felony, a Class C felony; and reckless endangerment of "other persons . . . . unknown," a Class E felony. Immediately thereafter, the trial court held a bifurcated hearing in order for the jury to determine whether the appellant was a criminal gang member who committed criminal gang offenses with regard to the attempted murder and aggravated assault convictions. See Tenn. Code Ann. § 40-35-121(a)(3)(A)(i), (h)(1). During the hearing, the State presented evidence that the appellant was a member of the

Athens Park Bloods. The jury determined that the appellant was a criminal gang member who committed criminal gang offenses, elevating his attempted murder and aggravated assault convictions to Class A and B felonies, respectively. See Tenn. Code Ann. § 40-35-121(b).

## II.  Analysis

### A.  Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his convictions for attempted second degree murder and aggravated assault.  Regarding the attempted murder conviction, the appellant claims that the proof shows that he was thirty to fifty yards from Carlos Bennett at the time of the shooting and that he only acted recklessly when he fired the gun in Mr. Bennett's direction.  Regarding the aggravated assaults, the appellant claims that the evidence fails to show that Mr. McRae and Mr. McClanhan were in fear.  The State argues that the evidence is sufficient.  We agree with the State.

Second degree murder is . . . [a] knowing killing of another." Tenn. Code Ann. § 39-13-210.  A person commits criminal attempt when, acting with the kind of culpability otherwise required for the offense, the person

> (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a).  As charged in this case, aggravated assault occurs when a defendant intentionally or knowingly causes another reasonably to fear imminent bodily injury and uses a deadly weapon.  See Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii).

Taken in the light most favorable to the State, the evidence shows that on June 5, 2012, the appellant was sitting in the back seat of a car being driving by Mackenzie Coleman. As the car was traveling on Martin Luther King Avenue, the appellant saw Mr. Bennett, Mr. McRae, and Mr. McClanhan walking and told Ms. Coleman to stop. When Ms. Coleman stopped the car, the appellant got out; yelled, "Celos" and "Athens Park"; and fired three or four shots at Mr. Bennett. Mr. Bennett, having been shot previously, looked down at his chest to see if he had been hit and ran away. Mr. McRae and Mr. McClanhan also ran. Although the appellant claims that the evidence is insufficient to support his attempted murder conviction because Mr. Bennett was thirty to fifty yards away at the time of the shooting, we note that Mr. Bennett initially estimated that he was twenty-five to thirty yards from the Maxima. Regardless of the distance, the evidence shows that the appellant recognized Mr. Bennett and intentionally shot at him. Therefore, a reasonable jury could have concluded that the appellant knowingly tried to kill Mr. Bennett.

As to the aggravated assaults, "[t]he element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury." State v. Gregory Whitfield, No. 02C01-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. at Jackson, May 8, 1998). "Fear may be proved by circumstantial evidence, and a victim does not have to testify in order for the State to establish that the victim was in fear." State v. Charles Clevenger, No. E2012-01119-CCA-R3-CD, 2013 WL 2566191, at *7 (Tenn. Crim. App. at Knoxville, June 7, 2013), perm. to appeal denied, (Tenn. 2013) (citing State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008)).

Here, the evidence established that the appellant fired three or four shots at Mr. Bennett as Mr. Bennett, Mr. McRae, and Mr. McClanhan were walking together. As soon as the victims heard the gunshots, they ran. Mr. Bennett even testified that he looked down at his chest to see if he had been shot. Clearly, from these facts, a rational jury could have inferred that Mr. McRae's and Mr. McClanhan's running away resulted from their imminent fear of being harmed. Therefore, the evidence is sufficient to support the convictions.

## B. Motion to Suppress

The appellant contends that the trial court erred by denying his motion to suppress his audio-recorded conversation with William Phillips. Specifically, he claims that Mr. Phillips was an informant acting as a government agent and that Mr. Phillips deliberately elicited incriminating information from him, violating his Sixth Amendment right to counsel. The appellant asks that this court adopt a balancing test to determine whether an informant is acting as a government agent. The State argues that the trial court properly

determined that Mr. Phillips was not acting as a government agent and, therefore, properly denied the appellant's motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his audio-recorded conversation with Mr. Phillips. At a hearing on the motion, Detective Day testified that a couple of weeks before April 29, 2013, Mr. Phillips, who was an inmate in the Knox County Detention Facility, contacted the KPD "about a person in the detention facility that was talking about a homicide case, an apparent unsolved homicide." Detective Day, who primarily worked on unsolved cases, met with Mr. Phillip to talk about the case, which did not have anything to do with the appellant. Mr. Phillips agreed to keep a recording device with him and record some conversations with "the target." Detective Day instructed Mr. Phillips not to talk with the target about the target's pending charge. However, Mr. Phillips could talk with the target about anything else. Mr. Phillips would turn on the recorder before he left his cell and turn it off when he returned to his cell. Every couple of days, Detective Day would meet with Mr. Phillips to "see how [things] were going." Detective Day said that "when we finished our dealings, I got the device and downloaded the recordings off the recorder onto a disk."

Detective Day testified that Mr. Phillips told him that while Mr. Phillips was on his way to talk with the target, "another gentleman had talked to him about another case." Mr. Phillips did not know the inmate's name, just his cell number, and Detective Day used the number to learn the name of the inmate, who was the appellant. Detective Day contacted the investigator for the appellant's case and made a copy of the conversation for the investigator.

The State played the recording for the trial court. On the recording, Mr. Phillips can be heard walking through the jail, and then the following exchange occurs:

> The appellant (calling out): You seem like you know a little bit about the law, man. Alright, listen.
>
> Phillips (chuckling): I ain't no damn lawyer.
>
> The appellant: I know you ain't no lawyer. I'm not going to ask you nothing like what about this, what about that.
>
> Phillips: Ok.
>
> The appellant: If my lawyer didn't tell me something, like whose fault is that[?]

Phillips:  What did she not tell you?

The appellant:  She been telling me that I couldn't have one. And I went to the library and I seen that I could have one.

Phillips:  Have one of what, son?

The appellant:  A preliminary hearing.

Phillips:  Oh, okay.

The appellant:  I went to the library and I seen it[.]  [I]n the library the paper say that if they didn't give me one and I didn't waive it it should get dismissed because they denied me one.

Phillips:  Well, I guess it depends on what you're here for, and I typically don't ask.  What's your deal?

The appellant:  I got an attempt.

Phillips:  Attempted murder charge?

The appellant:  Yep.  I got a presentment.  I don't got a warrant.  I got a presentment. . . . My lawyer been telling me I couldn't have [a preliminary hearing.]

Phillips:  Well, take it up with her when she calls you.

. . . .

The appellant:  You think they will dismiss it?

Phillips:  That I don't know.  You know, hell, what have they got on ya?

The appellant:  Just he say she say. . . . Just somebody saying I shot at him.  And I don't even see how that's attempted murder because didn't nobody get hurt.  Didn't nobody get hurt at all, bro.

Phillips: You just shot at him? That's it?

The appellant: That's it. I missed. I didn't hit shit but a window. And . . . the person whose window that I hit . . . he don't even know who did it. . . .

Phillips: So nobody got hurt?

The appellant: Nobody got hurt at all, bro.

On cross-examination, Detective Day acknowledged that he gave Mr. Phillips the recording device in order for Mr. Phillips to record a specific individual. The target individual was in jail for a rape charge, and Detective Day told Mr. Phillips that he could not talk with the target about the rape. Detective Day told Mr. Phillips, though, that he could talk with the target about anything else.

Captain Terry Wilshire of the Knox County Sheriff's Office testified that he was a facility commander for the Knox County Detention Facility and reviewed records related to the appellant and Mr. Phillips. On April 29, 2013, Mr. Phillips was not a trustee in the detention facility. Captain Wilshire did not find any record of disciplinary actions related to Mr. Phillips or the appellant. However, he found a September 14, 2013, incident report involving the two men.

At the conclusion of the testimony, the State argued that the trial court should deny the appellant's motion to suppress because Mr. Phillips was not targeting the appellant, the appellant was "the one who engaged Mr. Phillips about his case," and the State came to possess the appellant's confession "by happenstance or luck." Defense counsel acknowledged that the appellant initiated the conversation with Mr. Phillips but argued that Mr. Phillips was a state agent who then violated the appellant's Sixth Amendment right to counsel by asking him about the facts of his case, which had nothing to do with the appellant's initial question to Mr. Phillips regarding his preliminary hearing.

The trial court stated that Mr. Phillips "did start pumping the defendant for information" and that Mr. Phillips "apparently saw an opportunity to maybe pick up some information from this fellow that might help him in the eyes of the police." However, the court ruled that Mr. Phillips was a state agent only with respect to the target individual, stating that "there was no instruction by the police to do anything with Mr. Williams. It was not police action that caused the conversation between Bill Phillips and Mr. Williams. Mr. Williams initiated the conversation." The trial court concluded that Mr. Phillips "was [not] doing anything manipulating anyone in any manner to try to get

- 13 -

information from Mr. Williams in violation of his right to counsel" and denied the appellant's motion to suppress.

The Sixth Amendment guarantees the accused, after the initiation of formal charges, the right to rely on counsel as a medium between himself and the State. Maine v. Moulton, 474 U.S. 159, 176 (1985). If adversarial proceedings have begun, the accused may not be subjected to further interrogation by government authorities until counsel has been made available to him, unless the accused himself initiates further communication. See Michigan v. Jackson, 475 U.S. 625, 636 (1986). "In Tennessee, the Sixth Amendment right to counsel attaches with the initiation of criminal charges through an arrest warrant, a preliminary hearing (if no arrest warrant is issued), or an indictment or presentment (when the charge is initiated by the grand jury)." State v. Turner, 305 S.W.3d 508, 516 (Tenn. 2010) (citing State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980)).

"[T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." Moulton, 474 U.S. at 17. "[T]he clear rule of Massiah [v. United States, 377 U.S. 201 (1964),] is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401 (1977). In order to determine whether there has been a Sixth Amendment violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of Massiah. State v. Bush, 942 S.W.2d 489, 513 (Tenn. 1997). The Sixth Amendment right to counsel not only applies to direct confrontations by known government officers but also to "'indirect and surreptitious interrogations'" by covert government agents and informants. United States v. Henry, 447 U.S. 264, 273 (1980) (quoting Massiah v. United States, 377 U.S. at 206).

As this court recently noted,

> Some courts have applied a bright-line rule that "[a]n informant becomes a government agent . . . only when the informant has been instructed by the police to get information about the particular defendant." United States v. Birbal, 113 F.3d 342, 346 (2d Cir.1997); see Ayers [v. Hudson], 623 F.3d [301,] 310–11 [6th Cir. 2010] (citing cases). Other courts have rejected a bright-line rule approach and have held that the determination of whether an individual is a government agent depends upon the facts and circumstances of each case.

- 14 -

See Ayers, 623 F.3d at 311 (citing cases).

State v. Howard Hawk Willis, No. E2012-01313-CCA-R3-DD, 2015 WL 1207859, at *63 (Tenn. Crim. App. at Knoxville, Mar. 13, 2015). However, this court specifically rejected the bright-line rule, instead concluding,

> "[T]he infinite number of ways that investigators and informants can combine to elicit information from an unsuspecting defendant precludes us from establishing any litmus test for determining when an informant is acting as a government agent under Massiah." Matteo, 171 F.3d at 906 (McKee, J., concurring). Rather, we will examine the particular facts and circumstances of each case to determine whether an informant was acting as a government agent at the time that the informant elicited information from a defendant.
>
> To establish that the informant was a government agent, "'there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation took place.'" Id. at 893 (quoting Depree v. Thomas, 946 F.2d 784, 794 (11th Cir. 1991)). A defendant need not present direct evidence of a Sixth Amendment violation. Ayers, 623 F.3d at 312 n.8. Because "[d]irect proof of the State's knowledge will seldom be available," the defendant must only present evidence that "the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel." Moulton, 474 U.S. at 176 n.12 (citation and internal quotation marks omitted).

No. E2012-01313-CCA-R3-DD, 2015 WL 1207859, at *64.

Under the facts and circumstances of this case, we agree with the trial court that Mr. Phillips was not a government agent. Granted, Mr. Phillips was using a recording device at the direction of the KPD. However, Detective Day gave the recording device to Mr. Phillips in order for Mr. Phillips to record a specific individual, who was not the appellant, with possible information about a cold case. In fact, Detective Day had never even heard of the appellant when he gave the device to Mr. Phillips. In short, nothing indicates that Detective Day must have known that Mr. Phillips was likely to obtain incriminating statements from the appellant in the absence of counsel. Therefore, the trial court properly denied the appellant's motion to suppress.

## C. Sentencing

Finally, the appellant contends that the trial court erred by enhancing his sentences based upon his juvenile criminal history. The State argues that the trial court properly sentenced the appellant.

At the appellant's sentencing hearing, no witnesses testified. However, the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-year-old appellant was born in Knoxville but went into the custody of family friends when he was three months old. When the appellant was eleven years old, his mother moved him to Florida. However, three months later, he went to live with his maternal grandmother. In the report, the appellant described his childhood as "'rough'" and stated that he began "'gang banging.'" He also stated that he was placed in Mountain View Youth Development Center when he was fifteen and returned home nineteen months later. He was home for two months but returned to Mountain View and stayed there until he was eighteen years old. The appellant reported that he had never been employed. He described his mental health as "fair" and his physical health as "poor" due to headaches and back problems resulting from a fight in the Knox County Detention Facility. The report shows that the appellant was adjudicated delinquent in juvenile court because of an aggravated robbery when he was fifteen years old and a carjacking when he was fourteen years old, and the State introduced certified copies of the adjudications into evidence. The State also introduced a certified copy of a juvenile adjudication for attempted carjacking, committed when the appellant was fourteen years old, and certified copies of adult misdemeanor convictions of driving without a license, violating the seatbelt law, driving without proof of insurance, possession of a weapon, criminal impersonation, and theft.

The State argued that the appellant's juvenile adjudications for aggravated robbery and carjacking, Class B felonies in criminal court, classified him as a Range II, multiple offender, and the trial court agreed with the State. The trial court also found the following enhancement factors applicable to the appellant sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (3), that "[t]he offense involved more than one (1) victim"; (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high"; (13)(C), that at the time of the felony crimes, the defendant was on probation; and (16), that "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult." Tenn. Code Ann. § 40-35-114(1), (3), (8), (10), (13)(C), (16). The trial court also

applied factor (9), that "[t]he defendant possessed or employed a firearm . . . during the commission of the offense," to his attempted second degree murder and aggravated assault convictions. Tenn. Code Ann. § 40-35-114(9).

The trial court sentenced the appellant as a Range II, multiple offender to thirty years for count one, attempted second degree murder, a Class A felony; eight years for count two, employing a firearm during the commission of a dangerous felony, a Class C felony; fifteen years each for counts three and four, aggravated assault, Class B felonies; and three years for count five, reckless endangerment, a Class E felony. The trial court ordered that the appellant serve the eight-year sentence in count two consecutively to the thirty-year sentence in count one as required by statute. See Tenn. Code Ann. § 39-17-1324(e)(1). The trial court also ordered that the appellant serve his fifteen-year sentences in counts three and four and his three-year sentence in count five concurrently with each other but consecutively to his sentences for counts one and two for a total effective sentence of fifty-three years.

Initially, we note that the trial court misapplied enhancement factor (3), that the offenses involved more than one victim. The victims in this case were Carlos Bennett, Barry McRae, Kaleb McClanhan, and the public at large, all of whom were named in counts one, three, four, and five, respectively, of the indictment. As this court has stated, "the multiple victim factor is not applicable when separate convictions are based upon the existence of the separate victims." State v. Kerry D. Hewson, No. M2004-02117-CCA-R3-CD, 2005 WL 2438386, at *7 (Tenn. Crim. App. at Nashville, Sept. 28, 2005). Given that the jury convicted the appellant of separate felony convictions related to all of the victims, the trial court could not apply enhancement factor (3) to the sentences. In any event, as our supreme court has explained, a trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed. . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012).

The appellant contends that the trial court improperly enhanced his offender classification to a Range II, multiple offender based on his juvenile adjudications. We disagree. Tennessee Code Annotated section 40-35-106(a) provides that a trial court may sentence a defendant as a Range II, multiple offender by finding that the defendant has received:

> (1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes . . . ; or

(2)   One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

Previously, our Code did not allow trial courts to use a defendant's prior juvenile adjudications to establish the defendant's range classification.  See Tenn. Code Ann. § 40-35-106(b)(3) (2006) (prohibiting the use of juvenile adjudications as prior convictions for range classification purposes).  However, in 2010, our legislature amended the Code to allow for enhanced range classification upon "a finding or adjudication that a defendant committed an act as a juvenile that would constitute a Class A or Class B felony if committed by an adult."  Tenn. Code Ann. § 40-35-106(b)(3)(B).  The change was to apply "to all defendants committing offenses on or after July 1, 2010."  Tenn. Code Ann. § 40-35-106 (Compiler's Notes).

The appellant "takes the position that T.C.A. § 40-35-106(b)(3)(B) goes against long standing policy of additional safeguards to protect the constitutional interests of minors."  This court, though, has addressed the statutory change, stating as follows:

> The legislature has now seen fit to give juvenile adjudications even less protection, by allowing the sentencing judge to consider acts that would constitute a Class A or Class B felony regardless of whether the Defendant was transferred to criminal court under our transfer statute or any other.  During the discussion on the Senate floor of this 2010 amendment to the statute, Senator Doug Jackson noted that juvenile adjudications do not involve the same constitutional guarantees afforded an accused in adult criminal court but commented that the amended provision permits the use of those juvenile adjudications to enhance a Defendant's range.  See Tenn. Senate Session, Debate on Senate Bill 3314, April 15, 2010.  The Senate was not dissuaded by Senator Jackson's comments and passed the amendment into law.

State v. Fusco, 404 S.W.3d 504, 544-45 (Tenn. Crim. App. 2012).  Thus, we conclude that the trial court properly sentenced the appellant as a Range II, multiple offender based on his prior juvenile adjudications for aggravated robbery and carjacking.

- 18 -

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE